STATE ex Rel. KEENEY, Respondent, *v.* AYERS, Governor, et al., Appellants.

(No. 7,814.)

(Submitted April 24, 1939. Decided June 17, 1939.)

[92 Pac. (2d) 306.]

548

*Mr. Howard Toole,* and *Messrs. Booth & Booth,* for Appellants, submitted an original and a reply brief; *Mr. Toole* and *Mr. Edwin S. Booth* argued the cause orally.

*Mr. Wellington D. Rankin* and *Mr. Arthur P. Acher,* for Respondent, submitted a brief; *Mr. Rankin* argued the cause orally.

*Mr. A. Mark Levien,* of the Bar of New York, *Amicus Curiae,* submitted a brief in behalf of the American Civil Liberties Union.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Petitioner was granted a writ of mandate by the district court of Lewis and Clark county, requiring the State Board of Education and the president of the University to reinstate him as librarian and professor of library economy at the Montana State University. The State Board of Education and the president of the University have appealed from the judgment.

The facts alleged and proven are that the petitioner's employment began on September 1, 1931, and that his initial employment was for the year ending September 1, 1932. Thereafter, by action of the appellant board, he was given new annual contracts for the periods ending September 1 of the years 1933, 1934, 1935, 1936, and 1937. Each of these contracts consisted only of a "notice of appointment" signed by the chancellor or executive secretary, and an "acceptance of appointment" signed by the petitioner. However, the notice of appointment bore the statement, "This appointment is subject to the regulations governing tenure printed on the reverse side of this sheet." These regulations consisted of ten paragraphs designated: "(University Act No. 673, Adopted by the State Board of Education June 22, 1918, and Amended April 8, 1919, April 26, 1921, and April 3, 1922.)"

The pertinent paragraphs of the regulations are as follows:

"2. Professors and associate professors are on permanent appointment; provided, however, that the *initial* appointment to a full professorship or to an associate professorship may be for a *limited* term. Such *limited* term appointment may be renewed; provided, however, that *reappointment after three years of service shall be deemed a permanent appointment.*"

"5. At the expiration of the term of appointment of a professor or an associate professor, if appointed for a limited term, or of an assistant professor, lecturer, instructor, or assistant, there is no obligation whatever to renew the appointment, and without renewal the appointment thereupon lapses and becomes void. In every case of such non-renewal of appointment, official notice thereof shall be given by the chief executive of the institution, station or division, with the approval of the chancellor, not later than April 15th; provided, that a notice given ninety days prior to the expiration of the contract shall be sufficient in case of the non-renewal of the appointment of any member of the Agricultural Extension Staff."

"7. Any administrative officer or any member of an instructional or scientific staff may be removed at any time by the

Board, (a) after a hearing, (b) on the recommendation of the Chancellor; provided, that with such recommendation there shall be transmitted a statement from the chief executive of the institution, station or division with which such officer or staff member is connected, and also a copy of any report of the Committee on Service prepared in accordance with the provisions of Section 8 below.''

''In case of inefficiency, reprehensible conduct or insubordination, the Chancellor may suspend any administrative officer or member of the instructional or scientific staffs until the next regular or special meeting of the Board. In such case the payment of salary shall cease at the time of suspension. If the charges made are not sustained by the Board, salary shall be paid for the period of suspension. The Board may direct the suspension of any administrative officer or member of any instructional or scientific staff pending an investigation by the Chancellor of charges presented.''

''8. For the purpose of securing to all administrative officers and members of instructional and scientific staffs proper professional tenure, and for the purpose of promoting efficient service to the University, there is hereby established in each of the institutions of the University a Committee on Service to consist of one professor appointed by the Chancellor, one professor appointed by the president, one professor elected by the Faculty of the institution. The members of such committee shall be appointed to serve for one year beginning September first. Whenever any member of the Committee on Service becomes disqualified for any reason, it shall be the duty of the proper appointing officer to appoint a successor for the unexpired term.

''It shall be the duty of such Committee on Service at the direction of the chief executive of the institution, station, or division, or upon the request of any member of a staff whose removal is proposed, or who is under suspension, to inquire into the case and to submit a report of its findings to said chief executive and to the staff member involved. The chief executive shall transmit a copy of such report to the Chancellor for the

consideration of the Board. At the time of such consideration the officer or member involved shall have the right to appear personally before the Board in his own defense.''

Substantially the only difference in these six contracts, except as to dates of commencement and termination, was the striking out, on the back of the last contract, of regulation 2.

Petitioner completed each of these contracts by signing the acceptance of appointment thereon and returning it to the president of the University. His acceptances were uniform, except that in the last one, from the back of which regulation 2 had been stricken, he added the following paragraph before his signature: ''In signing this acceptance I do not mean to accept in any way a temporary appointment in lieu of my regular status as a professor on permanent tenure but to indicate my willingness to continue to serve in my present capacity.''

Upon receipt of it, the president wrote petitioner a letter reading:

''July 1, 1936.

''Professor Philip O. Keeney,

''Montana State University.

''My Dear Professor Keeney:

''We had delayed accepting and transmitting to Helena your modified acceptance of the contract issued you after the April meeting of the State Board of Education. The reason for this is that neither this office nor that of Dr. Swain at Helena is authorized to enter into subcontracts or side agreements other than the specified contract.

''On my last visit to Helena I discussed the matter with Dr. Swain, and he and I both looked up your contract tenure status and found that you had been issued nothing but the one year contract form year after year and that this was done on special instructions from Dr. Clapp. The paragraph with reference to tenure of professors on the back of the contracts is a general statement only and does not apply where a specific one year contract is offered. Mr. Clapp had indicated that he was not so completely satisfied with your cooperation and with the general effect of your influence on the students from the standpoint

of the parents of this state that he was willing to recommend you for permanent status.

"Certainly, as a result of happenings during the past academic year, I have had nothing which would encourage me to feel more strongly either one way or the other than Dr. Clapp had felt during the whole of your tenure here. What I proposed to do was to let the *status quo* continue through the coming year until we could find more definitely whether the library is running efficiently and effectively, whether you and I can cooperate freely and fully, and whether you are happy in the work you are doing here. Naturally, if any of these conditions are not true, then I would not wish to urge you to remain and be unhappy and make the rest of us unhappy, too.

"This time you have been offered exactly the same sort of contract that you have had in the past, and any writing on your acceptance blank naturally does not affect your standing one way or the other. However, as I have already told you, I am very anxious to work out our mutual problems to our joint best advantage, and I shall certainly see that you are protected in every way in your interests as long as things are going as nicely as they have been recently.

"Sincerely yours,

"GEORGE FINLAY SIMMONS,

"President."

Apparently without further discussion or correspondence petitioner executed the oath of office which had been required of him each year, and proceeded to fill his position as librarian and professor during the school year of 1936–1937.

On April 6, 1937, the president wrote petitioner a letter reading as follows:

"April 6, 1937.

"Professor Philip O. Keeney,

"Montana State University.

"Dear Professor Keeney:

"As I told you a year ago, and reiterated in my letter of July 8th [1st?] of last year, I had hopes that our library and general personnel problems would solve themselves so well during this

year that the matter of your continuing on this campus would be beyond question. In that letter of July 8th [1st?] I pointed out that on special instructions from Dr. Clapp you had been continued from year to year on one-year contracts only, that Dr. Clapp had indicated himself not completely satisfied with your services and influence, and that I had been similarly disturbed. I should like to quote further from that letter: 'What I proposed to do was to let the *status quo* continue through the coming year until we could find more definitely whether the library is running efficiently and effectively, whether you and I can cooperate freely and fully, and whether you are happy in the work you are doing here. Naturally, if any of these conditions are not true, then I would not wish to urge you to remain and be unhappy and make the rest of us unhappy, too.'

"Unfortunately I have not been completely happy about conditions, therefore, I have indicated to Dr. Swain and the State Board of Education that I wish to take advantage of the provisions of paragraph 5 in the regulations in regard to tenure of office of instructional and scientific staffs, as printed on the back of the regular contract forms, which hold that in a situation of this sort 'there is no obligation whatever to renew the appointment, and without renewal the appointment thereupon lapses and becomes void.'

"I trust that you will be able to locate yourself in some place where the environment is less disturbing to you and where you find yourself in more sympathy with the administrative aims of the institution.

"Sincerely yours,

"GEO. FINLAY SIMMONS,

· "President."

It is admitted that there were no charges filed, no investigations made, and no hearing had under regulations 7 and 8, or otherwise.

There is no substantial question of fact. The sole question is whether by reason of the foregoing facts petitioner had attained the status of permanent appointment under the provi-

554

sions of regulation 2, so as to require a hearing and investigation under regulations 7 and 8, or whether he was still under temporary or limited appointment requiring only notice of termination under regulation 5, by reason of the fact that each contract was for a term of only one year. Thus the question is not as to the length of petitioner's term of contract, but rather as to his temporary or permanent status as defined by the regulations.

The pertinent part of regulation 2 is: "Provided, however, that *reappointment* after three years of service shall be deemed a permanent appointment." Appellants contend that that provision was controlled and annulled by the fact that each of the fourth, fifth and sixth contracts was for only one year. However, the same sentence which provides that "such limited (initial) term of appointment may be renewed" (which was done in this case), contains the further clause: "Provided, however, that *reappointment* (not reappointment for more than one year, but any reappointment) after three years of service shall be deemed a permanent appointment." The length of the reappointment would seem immaterial. Reappointment after three years' service is reappointment after three years of service, whether it is a reappointment for one year or for twenty-five. It must, therefore, under the board's regulations, be "deemed a permanent appointment."

In this connection it should be emphasized that the only difference between a temporary and a permanent appointment under the rules is that as to the former, "without renewal the appointment thereupon lapses and becomes void" automatically and without hearing, and upon mere notice thereof (Regulation 5), which was given; whereas in the case of a permanent appointment, the employment automatically continues, unless terminated after an investigation and a hearing, as provided in regulations 7 and 8. The difference is thus not in the length of the tenure, but in the nature of it—whether terminable with or without an investigation and hearing. That petitioner after his first three years' service enjoyed permanent status and, therefore, was entitled to a hearing before removal, was not in-

consistent with, nor affected by, the fact that his contracts were from year to year.

The appellants first impeach the validity of the regulations adopted by the board, so far as permanent status of professors is concerned. However, the board adopted the same some twenty-one years ago and has operated under them ever since, and they were clearly within its authority under Article XI, section 11, Constitution of Montana, and section 853, Revised Codes. (*Barbour* v. *State Board of Education*, 92 Mont. 321, 13 Pac. (2d) 225.)

Appellants next contend that if the rules are valid, they are only for the board's governance and did not become part of the contract of each professor so as to confer any rights upon petitioner. However, as stated above, each contract expressly recited that it was "subject to the regulations governing tenure printed on the reverse side of this sheet." The contracts having been so framed and accepted, appellants are not now in a position to contend that the regulations were not part of the contract.

Appellants finally contend that by reason of their action in striking out regulation 2 on the back of the sixth annual contract, which is the one here in question, and by reason of petitioner's performance of the contract after the ensuing correspondence above set forth, he waived his right to claim permanent status. However, it is clear that upon accepting his fourth annual contract, in which regulation 2 was not stricken, he came within the clause thereof providing "that reappointment after three years of service shall be deemed a permanent appointment." His status thereupon came within the class of permanent appointments and was not altered by the appellant board's act of striking the regulation from the back of the sixth year's contract.

Even if petitioner's status had not become permanent under the first five contracts, in which regulation 2 was included, the later elimination from the sixth contract would not seem material so that its acceptance by petitioner could be claimed as a waiver. It seems clear that under the constitutional and

statutory provisions above noted, the regulations of the State Board of Education made within jurisdiction have the force of law, and become part of the contracts made thereunder to the same effect. Striking the regulations from the contract could have no more effect than striking a provision of a statute, and petitioner's acceptance of the contract would no more constitute a waiver of the regulation than it would constitute a waiver of the statute.

That it was not considered as a waiver is apparent from the president's letter of July 1, 1936, in which he said: "This time you have been offered exactly the same sort of contract that you have had in the past, and any writing on your acceptance blank naturally does not affect your standing one way or the other." His contention was that the striking of regulation 2 was immaterial, and that respondent had no permanent status to waive.

Finally, since petitioner's acceptance challenged the effect upon his permanent status of the striking of paragraph 2, and since, as just stated, the president informed him that the new contract was "exactly the same sort of contract" as the former ones, it cannot properly be maintained that by proceeding to furnish his services and draw his salary he waived whatever status had theretofore accrued to him under the statutes and regulations.

A like result as to the rights of one for whose protection a law was enacted was reached by this court in *Day* v. *School District No. 21*, 98 Mont. 207, 38 Pac. (2d) 595. In that case the question was the application of the public school teachers' tenure Act, section 1075, Revised Codes. There this court held unanimously that the plaintiff was entitled to the benefit of the statute, and that in the absence of the statutory notice of dismissal her contract of employment continued.

It seems obvious to us that petitioner's right under the regulations of the Board of Education is as definite as the plaintiff's rights under the statute in the *Day Case*, and that it could not be divested by the action of the board in striking regulation 2 from the sixth year's contract.

Whether the appellant board could have affected petitioner's rights after they had attached by repealing or amending its regulations is not properly before us, since the board did not attempt to do so. However, the question would seem to be concluded by the decision of the United States Supreme Court in the case of *State ex rel. Anderson* v. *Brand*, 303 U. S. 95, 58 Sup. Ct. 443, 82 L. Ed. 685, 113 A. L. R. 1482, in which it was held that a teacher's contract under a tenure Act could not be impaired by subsequent legislation. Certainly the Board of Education can no more impair contracts than can the legislature.

The judgment of the district court is affirmed.

ASSOCIATE JUSTICES ERICKSON, ANGSTMAN and STEWART concur.

MR. JUSTICE MORRIS:

I dissent. At the outset I deem it well to take some notice of the agitation that has maintained to a greater or less extent ever since Professor Keeney was refused reappointment upon the termination of his contract September 1, 1937. Such agitation has arisen from the presumption that the professor was not reappointed by reason of the fact that he appears to have been the leader in organizing the instructors at the University into an affiliate of the American Federation of Labor. The Attorney General testified that he had championed Professor Keeney's cause at the request of certain organizations of union labor; the president of the Montana A. F. of L., appeared as a witness for the professor and testified that he had employed counsel for Professor Keeney in his fight for reinstatement; the professor's counsel stated at the hearing before this court that his services had been retained by the A. F. of L.; A. Mark Levien, by permission of this court, filed a brief as *amicus curiae* "on behalf of the American Civil Liberties Union"; and some over-zealous partisans had a pamphlet printed entitled, "The Keeney Case," which by some unknown means reached the chamber desks of some of the members of this court prior to the hearing of

the case. This pamphlet purports to have been printed out of the state of Montana by parties giving an Illinois address.

It, therefore, has become quite obvious that there is a widespread belief that Professor Keeney is being persecuted by reason of his union labor activities. This belief appears to arise from the fact that the professor was notified that he would not be reappointed shortly after he had organized the teachers union at the University. There is no substantial evidence in the record upon which any such belief can be grounded. Both Dr. Simmons, the president of the University, and Dr. Swain, executive secretary, whose combined duties impose upon them the work of formulating a list of instructors at the University, testified that Professor Keeney's name had been left off the list of instructors which they had prepared for recommendation to the Board of Education prior to the date they had knowledge of Professor Keeney's organization of the instructors' union, and both testified that Professor Keeney's union labor affiliations had nothing to do with his name being omitted from the list of instructors recommended to the Board of Education for appointment or reappointment. This testimony was not impeached. There was testimony to the contrary in the nature of surmise and conjecture, but nothing in the nature of proof admissible under the established rules of evidence.

It is my view that the board has the discretionary power to make such appointments as it may choose, and this court has no right to review such exercise of power by the board, unless the board violates the law or acts arbitrarily or capriciously. (*State ex rel. School District No. 29, Flathead County,* v. *Cooney,* 102 Mont. 521, 59 Pac. (2d) 48, and cases cited.) I know of no legal restriction that prohibits instructors in the University from becoming affiliated with any reputable organization of any nature, union labor or otherwise, and on the other hand I know of no law that compels the Board of Education to choose or to decline to choose instructors for the University from the ranks of organized labor, or any other organization. All that appears essential is that the instructor selected sub-

scribe to the oath required by statute and satisfy the board as to qualifications.

All matters of policy relative to the selection and control of instructors by the board are vested by law in the board. The reasonable construction of the Constitution and statutes compels this conclusion. The sole question presented by the record for determination is the construction of the contract between Professor Keeney and the board, and a determination of their respective rights thereunder.

In my opinion the majority is in clear and direct conflict with established rules of law and the statutes of Montana in the following particulars:

1. The plaintiff's contract was at all times a contract from year to year, and he did not at any time gain permanent tenure. All the contracts made with the plaintiff from 1931 to the one ending September 1, 1937, state plainly on the face of each that it was for a period beginning September first of the year the contract was executed and ended September first of the following year. The term as expressed on the face of the contract controlled the printed part expressing anything to the contrary. When the contract for 1936–1937 was attempted to be modified by plaintiff in his acceptance and was received by the president of the University, the latter wrote the plaintiff as appears by Defendant's Exhibit M, the letter of July 1, 1936, recited in the majority opinion, declining to accept the modification. It does not appear that Professor Keeney made any protest about the construction given to his contract for the year 1936–1937 by Dr. Simmons by the letter of July 1, 1936, but continued with the University as theretofore and regularly drew in monthly installments the compensation allowed.

The plaintiff waived any claim to permanent tenure by both acts and contract. By acts in continuing in the service of the University for a full year, and accepting the compensation provided, after he had been advised that he was not on permanent tenure. (*Lane* v. *Superior Court,* 104 Cal. App. 340, 285 Pac. 860; *Linder* v. *Midland Oil Refining Co.,* 96 Colo. 160, 40 Pac. (2d) 253; *Gordon* v. *Curtis Bros. A. D. Moodie House-Moving*

*Co.,* 119 Or. 55, 248 Pac. 158; *Daeges* v. *Beh,* 207 Iowa, 1063, 224 N. W. 80; *Aker* v. *J. J. Fredella Co.,* 227 App. Div. 226, 237 N. Y. Supp. 442; 6 R. C. L. 605, sec. 28.) Our own statute is conclusive. Section 7492, Revised Codes, provides: "Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal." The proposal the plaintiff accepted was a contract denying right to permanent tenure.

Plaintiff waived any right he may have acquired by contract when he accepted the contract for 1936–1937 with paragraph 2 of the board's rules and regulations stricken. True, he attempted to avoid the effect arising from the stricken paragraph by making the reservation mentioned, but he was immediately advised by the president of the University that he had never been regarded as on permanent tenure, and his attempted modification of the contract would not be recognized. The attempt to modify was in effect a rejection of the proposal.

"A qualified acceptance is a new proposal." (Sec. 7493, Rev. Codes.) To constitute a contract a proposition must be accepted in the very terms in which it was made. (*Glenn* v. *S. Birch & Sons Const. Co.,* 52 Mont. 414, 158 Pac. 834; *J. Neils Lumber Co.* v. *Farmers' Lumber Co.,* 88 Mont. 392, 293 Pac. 288; *Brophy* v. *Idaho Produce & Provision Co.,* 31 Mont. 279, 78 Pac. 493; *Schwartz* v. *Inspiration Gold Min. Co.,* (D. C.) 15 Fed. Supp. 1030.)

When the time came for plaintiff to take up his duties on September 1, 1936, he had a contract which clearly denied his right to permanent tenure, and such contract was for one year from September 1, 1936, to September 1, 1937; his attempt to modify the contract so that it recognized his permanent tenure was rejected by both the president of the University and the Board of Education; he chose to accept employment on the basis tendered. If he were entitled to permanent tenure as contended for, he waived it, bartered it away for another year in his old position. "Any one may waive the advantage of a law intended solely for his benefit." (Sec. 8742, Rev. Codes.) But here

there was nothing for him to waive. His contract was merely from year to year, as I will presently show.

On the matter of waiver this court said in the case of *Northwestern Fire & Marine Co.* v. *Pollard,* 74 Mont. 142, 238 Pac. 594, 596:

" 'Waiver is the voluntary abandonment or surrender by a capable person, of a right known by him to exist, with the intent that such right shall be surrendered and such person forever deprived of its benefits. * * * If the person possessing such right so express himself by agreement or so conduct himself in relation to the right as to manifest an intention to forego its benefits, he will be held to have waived the right and cannot later insist upon it. Or, as it has been said, waiver is a voluntary relinquishment or renunciation of some right, a foregoing or giving up of some benefit or advantage, which, but for such waiver, a party would have enjoyed. It may be proved by express declarations, or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage * * * and failing to act, as to induce the belief that it was his intention and purpose to waive.' (Bowers on Law of Waiver, sec. 1.)

" 'The question of waiver is mainly a question of intention, which lies at the foundation of the doctrine. Waiver must be manifested in some unequivocal manner, and to operate as such it must in all cases be intentional. There can be no waiver unless so intended by one party and so understood by the other, or one party has so acted as to mislead the other and is estopped thereby. Since intent is an operation of the mind, it should be proved and found as a fact, and is rarely to be inferred as a matter of law. An intention to make the waiver claimed should clearly be made to appear by the evidence; and the best evidence of intention is to be found in the language used by the parties. The true inquiry is what was said or written, and whether what was said indicated the alleged intention. The secret understanding or intent of the parties is immaterial on the question of waiver. The intention need not necessarily be proved by express declarations, but may be shown by the acts

and conduct of the parties, from which an intention to waive may be reasonably inferred, or even by nonaction on their part.'" (See, also, *Solberg* v. *Sunburst Oil & Gas Co.*, 76 Mont. 254, 246 Pac. 168; *Griffith* v. *Montana Wheat Growers' Assn.*, 75 Mont. 466, 244 Pac. 277; *Enterprise Sheet Metal Works* v. *Schendel*, 55 Mont. 42, 143 Pac. 1059; also, *United States Fidelity & Guaranty Co.* v. *Miller*, 237 Ky. 43, 34 S. W. (2d) 938, 76 A. L. R. 12; *Missouri State Life Ins. Co.* v. *Le Fevre*, (Tex. Civ. App.) 10 S. W. (2d) 267; *Coon* v. *Campbell*, 138 Misc. 567, 240 N. Y. Supp. 772; *Eikelberger* v. *Insurance Co. of North America*, 105 Kan. 675, 189 Pac. 139; *Fahey* v. *Ancient Order of United Workmen*, 187 Iowa, 825, 174 N. W. 650; *Mitchell* v. *Kemp & Burpee Mfg. Co.*, (3 Cir.) 218 Fed. 843; *Collinson* v. *Wier*, 91 Misc. 501, 154 N. Y. Supp. 951.)

The plaintiff having a year to year contract, was not legally entitled to notice and hearing.

2. Adverting to the question that plaintiff never acquired permanent tenure, an elementary rule in the construction of contracts is that, "When an instrument consists partly of written words and partly of a printed form, and the two are inconsistent, the former control the latter." (Sec. 10523, Rev. Codes; see, also, section 7542, Id.; *Backer* v. *Parker-Morelli-Barclay Motor Co.*, 87 Mont. 595, 289 Pac. 571; *New Home Sewing Machine Co.* v. *Songer*, 91 Mont. 127, 7 Pac. (2d) 238; 12 Am. Jur., p. 797, sec. 253.) I quote from the latter: "It is a well settled rule that where part of a contract is written and part is printed, and the written and printed parts are apparently inconsistent or there is reasonable doubt as to the sense and meaning of the whole, the words in writing will control. The reason greater effect is given to the written than to the printed part of an agreement, if they are inconsistent, is that the written words are the immediate language and terms selected by the parties themselves for the expression of their meaning, while the printed form is for general use without reference to particular objects or aims."

In the face of the contract made by the University with the plaintiff, printed forms were used but blank spaces were left

to be filled in to show the term for which the particular instructor was employed. Paragraph 2 upon which plaintiff predicates his claim of permanent tenure appears on the back of the contract form, along with a complete set of rules and regulations adopted by the board and used in all contracts with instructors, reference being made thereto in the face of the form. In the contracts made with instructors on permanent tenure merely the first blank is filled in, giving the date of beginning of the term and a line drawn through the blank left for use when the end of the term is to be fixed. Hence, there is a clear conflict between the face of the contract as to the term of the instructor employed from year to year and paragraph 2 of the rules and regulations. It is not shown that the plaintiff was advised of this difference in the two classes of contracts, but it would appear unreasonable to presume that a man of his intelligence was without knowledge of the difference between his contracts and those on permanent tenure. In any event, the plain wording in the face of his contract advised him that it was merely an annual contract ending on the termination of the year therein specified.

3. The next vital conflict between the opinion of the majority and the established rules and statutes is that, if paragraph 2 of the contract used by the Board of Education can be said to give rise to a contract of any nature it would be unilateral in effect and unenforceable by one in the plaintiff's position. "Unilateral contracts mean contracts that lack mutuality. 'Mutuality of contracts means that an obligation must rest upon each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound.'" (*Hirsch & Sons Iron & Rail Co.* v. *Paragould & M. R. Co.*, 148 Mo. App. 173, 127 S. W. 623, 624. See, also, *Rich* v. *Doneghey*, 71 Okl. 204, 177 Pac. 86, 3 A. L. R. 352; *Friendly* v. *Elwert*, 57 Or. 599, 105 Pac. 404, Ann. Cas. 1913A, 357.) In section 114, 12 Am. Jur., it is said, "As is often said, both parties must be bound by a bilateral contract or neither is bound." Hence, in the case at bar, neither party

could have a right of action against the other by reason of the provisions of paragraph 2.

4. Plaintiff's action is an action for specific performance; an action to compel the Board of Education to reinstate him as an instructor at the University. The defendant board could not compel specific performance on the part of the plaintiff for the reason that a contract for personal services, such as is involved here, cannot be specifically enforced. Section 8720 provides in part: ''The following obligations cannot be specifically enforced: 1. An obligation to render personal service, or to employ another therein.'' The remedy must be mutual before either party may have specific performance. Section 8715, Revised Codes, provides: ''When either of the parties to an obligation is entitled to a specific performance thereof, according to the provisions of the last section, the other party is also entitled to it, though not within those provisions.'' (See, also, *Saint* v. *Beal*, 66 Mont. 292, 213 Pac. 248.) Section 8716 provides; ''Neither party to any obligation can be compelled specifically to perform it, unless the other party thereto has performed, or is compellable specifically to perform, everything to which the former is entitled under the same obligation, either completely, or nearly so, together with full compensation for any want of entire performance.'' No one will contend that the plaintiff was under any obligation to continue with the University any further than for the current year specified in his contract, and such being the situation he cannot compel the board to reinstate him.

Plaintiff seeks reinstatement by mandamus. By a long line of decisions of this court such remedy has been restricted within well defined limits. That the writ never issues as a matter of right but rests in the discretion of the court has been repeated so often by this court that a single citation I think sufficient. (*State ex rel. City of Miles City* v. *Northern Pac. Ry. Co.*, 88 Mont. 529, 295 Pac. 257.) It is also an established rule that courts will not substitute their discretion for the discretion reposed in officers and boards by legislative Act (*State ex rel. School District No. 29, Flathead County*, v. *Cooney*, 102

Mont. 521, 59 Pac. (2d) 48), and the writ lies only to compel a ministerial Act about which the board or officer has no discretion (*State ex rel. O'Connor* v. *McCarthy*, 86 Mont. 100, 282 Pac. 1045); the writ will lie only to compel the performance of an obligation enjoined by law (*Barnett Iron Works* v. *Harmon*, 87 Mont. 38, 285 Pac. 191). Mandamus will not lie unless the relator has a clear legal right to the performance of the Act or duty to compel which the writ is asked. (*State ex rel. Quintin* v. *Edwards*, 40 Mont. 287, 106 Pac. 695, 705, 20 Ann. Cas. 239; *State ex rel. Cutts* v. *Hart*, 56 Mont. 571, 185 Pac. 769, 7 A. L. R. 1678.) Under these long established rules if the plaintiff is entitled to any relief, certainly it is not by mandamus. No clear legal right to the writ is shown.

The majority, in support of their conclusions, cite *Day* v. *School District No. 21*, 98 Mont. 207, 38 Pac. (2d) 595, a case involving the construction of section 1075, Revised Codes, relating to the common schools. The control and management of the units of the University are provided for by section 852 to 930.4 of the Codes. When the legislature has provided specific laws for the control and management of particular institutions of the state and makes no reference to other Acts relating to other institutions of the state to supplement the specific Acts relating to the particular institution, it is my opinion that this court has no power to go outside the specific Acts to justify a decision of this court. "A special statute controls a general statute relating to the same subject-matter." (*In re Wilson's Estate*, 102 Mont. 178, 195, 56 Pac. (2d) 733, 737, 105 A. L. R. 367, and cases cited.) It was further said in that case: "A special statute covering a particular subject-matter must be read as an exception to the statute covering the same and other subjects in general terms." If we are obliged to accept the provisions of section 1075 of the common school laws to determine questions arising that relate to the University exclusively, it logically follows that we may by judicial construction, in some other action that may come before us, incorporate in the Acts relating to the University all the common school laws and determine that corporal punishment as provided by the common

school laws along with numerous other provisions of those Acts shall be controlling in matters relating to the University. The same answer can appropriately apply to the case of *State ex rel. Anderson* v. *Brand,* 303 U. S. 95, 58 Sup. Ct. 443, 446, 82 L. Ed. 685, 113 A. L. R. 1482, cited by the majority, a controversy arising out of the construction of the common school laws of Indiana, which it is asserted seems to conclude the controversy at bar. The legislature has not seen fit, by any reference thereto, to supplement the Acts made defining the powers and duties of the Board of Education as to the University, by the common school laws of Montana or Indiana, and it is clear judicial legislation for this court to do so. Such decisions may be persuasive but not controlling in such matters as that before us.

And it will be noted in the case of *State ex rel. Anderson* v. *Brand,* above, that the court there qualified its conclusions by statements rather clearly indicating that the state court might have determined that controversy on state grounds, but having determined it on a federal question the United States Supreme Court had the final right of determining the federal question, which involved construction of Article I, section 10 of the federal Constitution, U. S. C. A. This statement appears in that opinion: ''In 1927 the State adopted the Teachers' Tenure Act under which the present controversy arises. * * * By this Act it was provided that a teacher who has served under contract for 5 or more years, and thereafter enters into a contract for further service with the school corporation, shall become a permanent teacher and the contract, upon the expiration of the stated term, shall be deemed to continue in effect for an indefinite period, shall be known as an indefinite contract, and *shall remain in force unless succeeded by a new contract or* canceled as provided in the Act.''

Whether my view is correct or not in holding that the plaintiff's contract was from year to year only, the contract of 1936–1937 succeeded any and all prior contracts and was the only subsisting contract between the plaintiff and the Board

of Education when plaintiff was notified in April 1937 that he had not been reappointed.

In the *State ex rel Anderson* v. *Brand Case,* supra, the court held that a subsequent statute repealing a former violated the obligation of contract made under the first statute. The case of *Phelps* v. *Board of Education of West New York,* 300 U. S. 319, 57 Sup. Ct. 483, 484, 81 L. Ed. 674, to the contrary will be presently quoted in part.

The New Jersey common school laws on tenure are practically the same as ours. Amongst other things the laws provide that no teacher shall be dismissed or subjected to reduction of salary except for certain offenses and then only after written charges made and heard after notice to the person charged and with the right to have counsel and be heard. It was said in the *Phelps Case,* the question before the court being indicated by the opinion: ''The position of the appellants is that by virtue of the Act of 1909 three years of service under contract confer upon an employe of a school district a contractual status indefinite in duration which the legislature is powerless to alter or to authorize the board of education to alter. The Supreme Court holds that the Act of 1909 'established a legislative status for teachers, but we fail to see that it established a contractual one that the Legislature may not modify.' * * * It appears from a stipulation of facts submitted in lieu of evidence that after a teacher has served * * * three years it has not been customary to enter into further formal contracts with such teacher. * * * Although after the expiration of the first three years of service the employe continued in his then position and at his then compensation unless and until promoted or given an increase in salary for a succeeding year, *we find nothing in the record to indicate that the board was bound by contract with the teacher for more than the current year. The employe assumed no binding obligation to remain in service beyond that term.* Although the Act of 1909 prohibited the board, a creature of the state, from reducing the teacher's salary or discharging him without cause, *we agree with the courts below that this was but a regulation of the conduct of*

*the board and not a term of a continuing contract of indefinite duration with the individual teacher."* (Italics supplied.)

I am unable to discover any material difference in the *Phelps Case* and the *State ex rel. Anderson* v. *Brand Case,* supra, except what is indicated by this paragraph quoted from the Phelps decision: "This court is not bound by the decision of a state court as to the existence and terms of a contract, the obligation of which is asserted to be impaired, but where a statute is claimed to create a contractual right we give weight to the construction of the statute by the courts of the state. Here those courts have concurred in holding that the Act of 1909 did not amount to a legislative contract with the teachers of the state and did not become a term of the contracts entered into with employes by boards of education. Unless these views are palpably erroneous we should accept them." The New Jersey statute was upheld and that of Indiana declared to be in conflict with the federal Constitution.

Both the New Jersey and Indiana common school laws are much the same as our own on the question of tenure of teachers. The *Phelps Case* went to the United States Supreme Court on appeal from a decision in the supreme court of that state, and the *State ex rel. Anderson* v. *Brand Case* went up on certiorari to the supreme court of Indiana. Both sides in the controversy at bar may find support for their respective contentions in the two cases, but neither side may reasonably say that either United States case decisively determines our controversy. We must look to our own statutes for a correct solution.

The judgment should be reversed, the cause remanded with instructions to quash the writ and dismiss the action.