383 A.2d 1033.

Jean-Yves Drans *vs.* Providence College.

MARCH 24, 1978.

Present: Bevilacqua, C.J., Kelleher and Doris, JJ.

KELLEHER, J.   This is a declaratory judgment action in which the plaintiff, a former professor at Providence College, asked the Superior Court to rule that he was not subject to the mandatory retirement age of 65 established by the college in 1969 because he had secured academic tenure prior to that time. After a hearing, the trial justice ruled that the plaintiff was subject to the college's mandatory retirement policy, and judgment to this effect was entered in the Superior Court.

Before considering plaintiff's appeal, we would acknowledge the assistance rendered the court by amici curiae. Their briefs and oral presentations have helped to highlight an issue the ultimate resolution of which apparently is a matter of great interest to the nation's colleges and universities, their administrators, and faculties.

Providence College was founded in 1917 by the late Right Reverend Matthew Harkins, Bishop of the Diocese of

Providence. In issuing a charter to the college, the General Assembly declared that the college's material resources should be expended "in such manner as shall most effectually promote virtue and piety and learning in such of the languages and of the liberal and useful arts and sciences as shall be recommended from time to time by the said corporation * * * ." The charter also stipulated that "[n]o person shall be refused admission to said college as a student, nor shall any person be denied any of the privileges, honors or degrees of said college on account of the religious opinions he may entertain."

Since its inception the college has been conducted under the auspices of the Dominican Fathers, a Roman Catholic order of priests.[1] When the college hired plaintiff as an Assistant Professor of Modern Language in 1948, he had spent 10 years teaching French on a collegiate level in the Far East countries of Siam and Japan. Just prior to his arrival on campus, Providence College had adopted a voluntary pension plan for its lay faculty by joining the Teachers Insurance and Annuity Association (TIAA). When certain eligibility requirements were met, a teacher could elect to join TIAA by agreeing to pay 5 percent of his or her salary while the college made a contribution to the fund which amounted to 10 percent of the teacher's salary. When plaintiff was given the opportunity in the latter half of the 1950's to join this pension plan, he declined to do so although all of his lay colleagues opted to join.

In March of 1955 the college distributed a questionnaire to each member of the lay faculty, in which the teacher was asked to list his curriculum vitae. The introductory portion of the questionnaire made the following reference to tenure:

---

[1]The college's first class was composed of 75 students, and the original faculty numbered 9 Dominicans. In 1956 the faculty consisted of 120 members, and 100 of them were priests. In 1975, when this litigation came on for hearing, the trial justice was informed that there were then 194 faculty members; the religious component of this membership was approximately 49.

"Clarification of academic tenure: An instructor has no tenure, (Normal period for instructors is 3 years before being promoted to assistant professor); Assistant Professor – 3 years; Associate Professor – 5 years; Professor – full tenure. Tenure is contingent not only on satisfactory teaching with a normal load but also through evidence of scholarship, research, publications in learned journals, etc."

Later, in May of 1955, Professor Drans accepted a promotion and a 5-year contract as an Associate Professor. In 1960 he was made a full professor and offered a new contract that contained no termination date. The plaintiff testified that he asked the then President of the college about his open-ended contract and was assured that it meant he (Professor Drans) could teach at Providence College as long as he was able and willing to do so.

In 1966 the college for the first time articulated an official policy regarding tenure. Its pertinent portions, which were set forth in the Faculty Manual, read as follows:

"3.  A member of the faculty who has been granted tenure at Providence College may not be dismissed, except as provided in the following statement on tenure formulated by a joint conference of committees from the Association of American Universities and the American Association of University Professors:

"The termination for cause of a continuous appointment, or the dismissal for cause of a teacher previous to the expiration of term appointment, should, if possible, be considered by both a faculty committee and the governing board of the institution. In all cases where the facts are in dispute, the accused teacher should be informed in writing of the charges against him and should have the opportunity to be

heard in his own defense by all bodies that pass judgment on his case. He should be permitted to have an advisor of his own choosing who may act as counsel. There should be a full stenographic record of the hearing available to the parties concerned. In the hearing of the charges of incompetence, the testimony should include that of teachers and other scholars, either from his own or from other institutions. * * *

"Providence College accepts this statement as its basic policy governing dismissal under tenure."

It should be noted that this policy made no mention of retirement for age as a possible ground for the termination of tenured professors.

The policy statement set out in the Faculty Manual was taken from the *1940 Statement of Principles on Academic Freedom and Tenure* (1940 Statement of Principles) published by a Joint Conference of the American Association of University Professors (AAUP) and the Association of American Colleges (AAC). In April 1966 plaintiff was sent a letter formally notifying him that he had been granted tenure.

In 1967 a completely revised Faculty Manual was published, which incorporated in more elaborate detail the tenure provisions of the 1940 Statement of Principles.

"C.   *Tenured Faculty*

"Tenure at Providence College signifies that those who have been granted tenured status on the faculty will not have this status terminated or their teaching services discontinued, except for the following causes:

"i.    Retirement because of age;

"ii.   Extraordinary and unavoidable circumstances of financial exigency;

> "iii. Grave cause, e.g., proven professional incompetence, physical or mental disability, scandalous conduct, neglect of duty, criminal acts."

The 1967 manual was the first indication that tenured rights might be limited by retirement because of age. The 1940 Statement of Principles, which the manual referred to, provided as follows:

> "After the expiration of a probationary period, teachers or investigators should have permanent or continuous tenure, and their service should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies."

In 1968 the college amended the 1967 Faculty Manual by expressly endorsing the 1940 Statement of Principles and incorporating the above language into the manual.

The college initially adopted a mandatory retirement age in 1969, and the Faculty Manual was amended to read as follows:

> "In accordance with the action of the Faculty Senate (11/13/68) and of the Corporation of Providence College (2/28/69) the retirement age for members of the faculty is set at 65 years, as of July 1, the beginning of the fiscal year, except that after that age they may apply to the President for yearly appointments and be so appointed at his discretion."

Professor Drans testified that he first became aware of this mandatory retirement policy in January or February of 1970, when he returned to the college from a leave of absence in Mexico. His complaint to the Faculty Senate that the college retirement plan could not apply to him fell upon deaf ears.

In 1971 the college notified the lay faculty that the college would now make all future contributions to the TIAA fund

on their behalf. The plaintiff then consented to his inclusion in the TIAA pension plan by filling out an application form. He selected age 65 as his retirement age in the application, a figure he could change at any time.

Each year plaintiff was with the college he was sent a "Notice of Contract for Teaching Services." Each notice stated his rank, department, status, and salary for the ensuing year. These one-page forms did not set forth any other terms and conditions of plaintiff's employment (i.e., courseload, vacations, retirement, dismissal, etc.). Each year plaintiff's salary was increased, and each year he signed and returned the form. After 1972, however, Professor Drans refused to sign the contracts tendered to him although he continued to teach at the college until he reached the age of 65 in 1976.

The single issue presented in this controversy is whether plaintiff's tenurial rights limited the right of the college to initiate a mandatory retirement policy that would affect the faculty members who were enjoying the benefits of tenure. The trial justice found that plaintiff had acquired tenure in 1960 because the tenure policy had been impliedly incorporated within the contract he had signed that year. The court then held that the subsequently enacted mandatory retirement provisions of the Faculty Manual necessarily became incorporated into his succeeding contracts. Specifically, the trial justice ruled that Professor Drans, by his April 1970 signing of a form which indicated the salary that was to be paid to him during the 1970-71 academic year, had agreed to be bound by the college's mandatory retirement policy.

On appeal, the professor maintains he acquired a contractual right to lifetime employment when he gained tenure and that this right could not be and was not modified when he signed his 1970 standard contract renewal form which, except for the annual salary increases was identical to those presented to him during the previous years. The

college would have us affirm the Superior Court's decision that plaintiff consented to the modification of his contractual rights. Alternatively, the college argues that it had a unilateral right to institute a mandatory retirement policy at any time. Both amici agree that a grant of tenure does not immobilize an institution of higher learning from subsequently initiating other programs or policies that in some manner may affect the tenured teacher. They agree that colleges can, consistent with their outstanding tenurial obligations, inaugurate or alter a retirement plan as long as the plan or its modifications are reasonable and uniformly applied. They further agree that there may be instances where certain tenured teachers who are adversely affected by the imposition or modification of a mandatory retirement program should be given special consideration by the college administration. They disagree, however, as to whether Professor Drans should be accorded this kind of relief.

We cannot subscribe to the views expressed by the trial justice when he ruled that, although the college could not have forced the professor to retire at 65, the professor had agreed to be bound by the college's retirement plan when in April 1970 he signed a notice which notified him that his $13,910 annual salary for the academic (and fiscal) year 1970-71 would be payable in 12 installments. Initially, we will consider the question of consent and then discuss faculty tenure and how it relates to a college's retirement policies.

### Consent

First of all, nothing on the face of the renewal contract notified the professor that, by accepting the contract, he was embracing and approving the college's new mandatory retirement policy. As was noted previously, these form contracts simply set forth the individual's name, position, status, and salary for the ensuing year. Unlike the renewal contracts of other institutions, *Lewis* v. *Salem Academy & College*, 23 N.C. App. 122, 208 S.E.2d 404 (1974), the

standard forms used by the college did not expressly incorporate the provisions of the Faculty Manual. This court has expressed the view that a person is not bound by the terms of a written agreement if he had no knowledge of its terms because the manner in which they are embodied in the instrument would not lead a reasonable person to suspect that the terms are part of the contract. *Goldstein* v. *Rhode Island Hospital Trust National Bank,* 110 R.I. 580, 296 A.2d 112 (1972); *see* 3 Corbin, *Contracts* §607 (1960); Calamari, *Duty to Read — A Changing Concept,* 43 Ford. L. Review. 341 (1974).

The trial justice's reliance on the professor's salary increase in 1970 as a bargained-for exchange in return for the modification of tenure rights is misplaced. The record clearly indicates that the professor was routinely granted annual salary increases. The contract renewal form which was sent to him each year set forth the increment for the ensuing year. By signing the form, the professor was accepting the college's offer and obligating himself to teach at the college for the next year. He was not waiving vested tenurial rights. *La Shells* v. *Hench,* 98 Cal. App. 6, 276 P. 377 (1929); *Collins* v. *Parsons College,* 203 N.W.2d 594 (Iowa 1973); *State ex rel. Keeney* v. *Ayers,* 108 Mont. 547, 92 P.2d 306 (1939). *Contra Rehor* v. *Case Western Reserve University,* 43 Ohio St. 2d 224, 72 Ohio Op. 2d 127, 331 N.E.2d 416, *cert. denied,* 423 U.S. 1018, 96 S. Ct. 453, 46 L. Ed. 2d 390 (1975). In *State ex rel. Keeney* v. *Ayers,* for example, the plaintiff had executed five annual contract notices, which explicitly incorporated the university's policy that tenure was acquired after 3 years of probationary service. That provision was struck from the sixth contract tendered to him. The plaintiff signed the sixth contract although he protested that he had permanent tenure. The Montana Supreme Court held that he had not waived his right to claim permanent status by signing the sixth contract and continuing in the employ of the university. A similar result is called for here.

The professor cannot be faulted for continuing in the employ of the college while contesting the newly instituted mandatory retirement policy. We are confident that had he known that his April 1970 signature would be interpreted as signifying his agreement with the college's compulsory retirement plan, he surely would not have signed it.

### Tenure vis-a-vis Compulsory Retirement

Since the professor did not agree to be bound by the mandatory retirement policy, two questions remain. First, did the grant of tenure to the professor at a time when the college had no retirement policy limit the authority of the college from subsequently adopting a retirement policy? Second, even if the college had the authority to institute or change its retirement policy, can that new policy be validly applied to the professor?

The delineation of the various rights and obligations which arise out of the award of "tenure" has only recently been subjected to detailed analysis. *See Developments in the Law — Academic Freedom,* 81 Harv. L. Rev. 1045 (1968); Van Alstyne, *Tenure: A Summary, Explanation, and "Defense,"* 57 AAUP Bull. 328 (1971). When the professor attained tenure in 1960, the college had no rules, regulations, or policy statement defining and limiting the nature and scope of that status. The 1955 questionnaire simply provided that:

> "Tenure is contingent not only on satisfactory teaching with a normal load but also through evidence of scholarship, research, publications in learned journals, etc."

Therefore, we must look to the custom and usage of the academic community to discern the common understanding of tenure. As we said in *John F. Davis Co.* v. *Shepard Co.,* 71 R.I. 499, 504-05, 47 A.2d 635, 638 (1946), quoting *Myers* v. *Sarl,* 3 E. & E. 306:

> " '[W]hen it is shewn that a term or phrase in a written contract bears a peculiar meaning in the trade or

> business to which the contract relates, that meaning is, prima facie, to be attributed to it, unless, upon the construction of the whole contract, enough appears, either from express words or by necessary implication, to shew that the parties did not intend that meaning to prevail.' "

This principle is said to be especially true in the case of contracts in the academic community. *Greene* v. *Howard University*, 134 U.S. App. D.C. 81, 88, 412, F.2d 1128, 1135 (1969).

Tenure in the academic community commonly refers to a status granted, usually after a probationary period, which protects a teacher from dismissal except for serious misconduct or incompetence. *Collins* v. *Parsons College*, 203 N.W. 2d at 597; *American Association of University Professors* v. *Bloomfield College*, 129 N.J. Super. 249, 322 A.2d 846, 853 (1974); *Rehor* v. *Case Western Reserve University; Developments in the Law — Academic Freedom*, 81 Harv. L. Rev. 1045, 1049 (1968). The primary function of tenure is the preservation of academic freedom. The 1940 Statement of Principles provides:

> "Tenure is a means to certain ends; specifically: (1) Freedom of teaching and research and of extramural activities and (2) a sufficient degree of economic security to make the profession attractive to men and women of ability. Freedom and economic security, hence, tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society."

The job security which tenure provides is thought to benefit society by encouraging a scholar to vigorously pursue and disseminate his research without fear of reprisal or rebuke from those who support the conventional wisdom. Van Alstyne, *Tenure: A Summary, Explanation, and "Defense,"* 57 AAUP Bull. 328, 330.

With these principles in mind, we find it difficult indeed

to hold that tenure precludes the imposition of a mandatory retirement policy under all circumstances. If the scope of tenurial protection is no broader than necessary to protect academic freedom and to provide enough job security to make the profession attractive to young men and women, then an academic institution should have the authority to institute a mandatory retirement program. As long as the retirement plan is adopted in good faith, the age chosen is reasonable, and the policy is uniformly applied to all faculty members, the essential functions of tenure will not be compromised. *Rehor* v. *Case Western Reserve University*.

So far as we have been able to discover, *Rehor* is the only case in the country which has directly decided this issue.[2] The plaintiff in that case was granted tenure when the retirement age was 70 years. After the plaintiff's university merged with another one, the retirement policy was changed to provide for retirement at age 68, with discretionary annual appointments thereafter. The Supreme Court of Ohio upheld the power of the university to make reasonable, uniform changes in its retirement policies and further held that the plaintiff had consented to this contractual change. We believe that the holdings present an inconsistency which undermines the rationale upon which the court in *Rehor* reached its ultimate conclusion. If, as the court said, a university's personnel policies are impliedly incorporated into a professorial contract, then the college's unilateral right to make reasonable alterations thereof must be denied. On the other hand, if the college has the inherent

---

[2]In *Lewis* v. *Salem Academy & College*, 23 N.C. App. 122, 208 S.E.2d 404 (1974), the plaintiff asserted a right to teach until age 70 pursuant to a retirement policy similar to the one involved here. It provided for retirement at age 65 except that one could, upon request, teach until age 70 at the discretion of the Board of Trustees. The plaintiff asserted that the "usual and customary practice" of routinely granting such requests created a common law which proscribed the discretion of the Board of Trustees. The Court of Appeals of North Carolina affirmed the dismissal of the plaintiff's complaint. The issue presented here, whether the grant of tenure limited the authority of the university to *change* its retirement policy, was not raised.

or reserved authority to make changes unilaterally, it is idle to speak of retirement as a contractual term to which pedagogical consent is a sine qua non.

We believe the proper balancing of the prerogatives of the university and the rights of individual faculty members should be gleaned from the contract of the parties and from their reasonable expectations regarding university-wide regulations, rules, and policies. Many courts have implied some or all of the rules, regulations, bylaws, and policies of a university into faculty employment contracts. *Perry* v. *Sindermann*, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972); *Zimmerer* v. *Spencer*, 485 F.2d 176 (5th Cir. 1973); *Greene* v. *Howard University*, 412 F.2d 1128 (D.C. Cir. 1969); *Downs* v. *Conway School District*, 328 F. Supp. 338 (E.D. Ark. 1971); *Brady* v. *Board of Trustees*, 196 Neb. 226, 242 N.W.2d 616 (1976); *Hillis* v. *Meister*, 82 N.M. 474, 483 P.2d 1314 (1971); *Zimmerman* v. *Minot State College*, 198 N.W.2d 108 (N.D. 1972); *Rehor* v. *Case Western Reserve University*. With the exception of *Rehor*, these cases concerned faculty members who were dismissed or not reinstated in a manner which, they claimed, was contrary to certain university-wide policies or procedures. *Rehor* interpreted this line of authority incorrectly in our view, as holding that *all* of a university's rules, regulations, etc., are impliedly incorporated into faculty employment contracts. As we review the broad range of topics encompassed in the Providence College Faculty Manual (use of audiovisual aids, purchase requests, parking privileges, traffic regulations, etc.), we cannot subscribe to this all-inclusive incorporation. The effective management of our academic institutions would be seriously compromised if the contractual assent of every single faculty member was required before the college could, say, rewrite the procedures for borrowing a book from the library or change the discount rate being offered the faculty at the campus book store.

Having in mind the purpose of tenure and the reasonable expectations of those who wish to pursue a professional

teaching career at an institution of higher learning, we must reject Professor Drans's claim that his 1960 acquisition of tenure exempted him from the compulsory retirement program instituted by the college in 1969. He should have been aware that sometime during his teaching career his employer might see fit to install a retirement plan which would include some type of mandatory provision whereby a teacher would be required to forego any further classroom activities. The 1940 Statement of Principles recognized the need for institutional flexibility when it expressly provided for retirement for age as a permissible ground for the termination of tenured professors. The importance of this statement cannot be underestimated. Promulgated by a joint committee of the American Association of University Professors and the Association of American Colleges, the 1940 Statement, as with their other joint statements, was widely circulated and widely accepted in the academic community and, indeed, by Providence College. *Browzin* v. *Catholic University of America*, 174 U.S. App. D.C. 60, 64 n.8 (1975). Furthermore, even in a nonacademic setting, tenured positions are thought to be subject to retirement for age. *Maloney* v. *E.I. DuPont de Nemours & Co.*, 122 U.S. App. D.C. 268, 270 (1965); *People ex rel. Bagshaw* v. *Thompson*, 55 Cal. App. 2d 147, 153, 130 P. 2d 237, 241 (1942). Therefore, we conclude that the college had the power and authority, consistent with its outstanding tenurial obligations, to unilaterally institute a reasonable, uniformly applicable, mandatory retirement policy.

### Special Treatment

Having decided that the college could institute its compulsory retirement program, we must now decide whether it should be applied to Profesor Drans, who was 58 at the time the policy first became effective. Amicus AAUP contends that the college should be compelled to make some type of adjustment that will cushion the financial and emotional shock suffered by the professor's departure from

academia's front lines. Support for this belief can be found in another joint study by the AAUP-AAC, which resulted in the *1950 Statement on Retirement.*

> "When a new retirement policy or annuity plan is initiated or an old one changed, reasonable provision either by special financial arrangements or by the gradual inauguration of the new plan should be made for those adversely affected." *Academic Retirement and Related Subjects,* 36 AAUP Bull. 97, 116 (1950).

In its accompanying report, the joint committee explained the necessity for the requirement as follows:

> "The Committee would particularly emphasize the necessity of making equitable provisions for any staff member who may be adversely affected by a change in the retirement policy or plans of the institution with which he is associated. When long inattention is suddenly changed into action, long-time policies are sometimes initiated without reasonable provisions for those adversely affected. If, for instance, it has been customary to allow faculty members to teach until well after 70, and a fixed retirement age of, say, 68 is suddenly established, all of those past or nearing that age have their expectations suddenly changed unless special financial provisions are made for them or the plan is initiated gradually." *Academic Retirement and Related Subjects,* 36 AAUP Bull. 97, 110 (1950).

Amicus Boston University refers to a report by a subcommittee of the Association of American Law Schools (AALS), which concluded that a compulsory retirement policy may be changed in good faith and made applicable to all, including those with tenure, "if it does not defeat reasonable expectations." *Proceedings of the Association of American Law Schools,* 1969, Part II, at 178-81.

Obviously, as we examine the AAUP's advocacy of the "adversely affected" approach and study the AALS's

"reasonable expectations" theory, we see that both the professoriate and the administration recognize that there may be times when a college administration, because of its desire to maintain institutional flexibility, must make some type of an accommodation so that the economic security expectations of the tenured may be preserved. Equally clear is the fact that no fixed formula exists by which a determination can be made as to which tenured retiree is entitled to receive special consideration. However, there are several factors which merit consideration, including: (1) the length of time remaining between the announcement of the retirement plan or its modification and its actual application to the faculty member; (2) the age of the professor; (3) the professor's ability and willingness to teach beyond the retirement date; (4) the extent to which the unexpected retirement may be financially burdensome; (5) the prior notice, if any, the professor had that retirement was in the offing;[3] (6) the type of pension plan, if any, available at the institution; and (7) whether the retirement plan contains a provision whereby the responsible authority is given discretion to make annual appointments of faculty members that extend beyond the retirement date.

Having suggested some of the criteria that might be considered as we deal with the special treatment phase of this controversy, we can do no more because we believe that the professor's eligibility for "a reasonable transition provision" is best resolved, at least initially, in the Superior Court. Since we have stressed throughout this opinion that disputes

---

[3] The college's budget director testified that in May 1958 he conferred with the plaintiff and pointed out to Professor Drans that he could build up "quite a bit" of retirement annuity. The director offered a proposal whereby the professor would forego his annual salary increment for 1958-59 and the college would use this sum to enroll him in the TIAA or a similar type of program. According to the budget director's proposal, the salary increment would be reinstated in 1959-60 and continue thereafter with the professor's annual contribution to the pension plan amounting to $210. The director's efforts went for naught because the professor, in opting for the salary increment, told the director he was not interested in the plan.

involving tenure and retirement should be resolved by referring to the reasonable expectations within the academic community, after remand, evidence can be adduced in the Superior Court on the question as to what has been done, if anything, for those teachers who have found themselves in the same position as was Professor Drans when he learned that compulsory retirement was to be a way of academic life at Providence College. In remanding the case to the Superior Court, we would emphasize that we have ruled that the college had the authority to institute a retirement policy for all its faculty members, including those with tenure, but that this power is limited by an implied obligation to make reasonable transition provisions when the common practice within the academic community would dictate such a course of action.

The plaintiff's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court for further proceedings.

Mr. Justice Paolino and Mr. Justice Joslin did not participate.

*Abedon, Stanzler, Biener, Skolnik & Lipsey, Milton Stanzler,* for plaintiff.

*William F. McMahon,* for defendant.

*Richard A. Skolnik, Abedon, Stanzler, Biener, Skolnik & Lipsey, Matthew W. Finkin,* for School of Law, Southern Methodist University, *David M. Rabban,* for American Association of University Professors, *William B. Harvey,* for The Trustees of Boston University, Amicus Curiae.