SARAH T. COOK, *Admx. vs.* CLARENCE M. DUNBAR *et al.*

MARCH 11, 1941.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

268

BAKER, J. This is a bill in equity brought to have an account taken of the entire assets of a particular corporation so that the correct value of its stock may be arrived at, arbitration for this purpose as provided for in a certain contract having failed.

After a demurrer to the bill had been overruled by a justice of the superior court, the cause was heard at length upon its merits in such court, and a final decree was entered by the trial justice fixing the value of the entire assets of said corporation at $210,000, and ordering the respondents to pay one-third of such amount, *viz.,* $70,000, to the complainant, together with interest from a fixed date. From the entry of this decree the complainant and the respondents appealed and these appeals are now before us.

In her appeal the complainant contends that the trial justice, by erroneously fixing the date from which interest should run, did not allow her sufficient interest on the sum he ordered to be paid to her. The respondents' appeal is on the grounds that their demurrer to the bill should have been sustained; that the value of the assets of the corporation in question as fixed by the trial justice was too high; and that the complainant was not entitled to any interest on whatever sum may be found to be due her.

The bill of complaint sets out, in substance, that the complainant is the widow of Charles D. Cook and is the duly appointed and qualified administratrix of his estate; that on or about February 7, 1906, said Cook and the respondents Dunbar and Smith, having decided to go into the business of manufacturing rolled gold plate and seamless wire and tubing, organized for that purpose, under the laws of this

state, a corporation named Cook-Dunbar-Smith Co. with an authorized capital stock of 500 shares, all of which were issued, each of said incorporators receiving 166 2/3 shares; and that such shares owned by Cook passed to the complainant as administratrix of his estate, and are held by her as part of the assets of said estate.

The bill further alleges that, for the protection of the rights of said stockholders, on February 16, 1906, they entered into an agreement in writing with each other. This agreement, which was under seal, contained the following provisions:

"1. No one of the parties hereto shall at any time within three (3) years from the date hereof sell, assign, pledge or hypothecate the whole or any portion of his stock in said corporation without the written consent of the other parties hereto.

"2. After said three (3) years, if any one of said parties wishes to sell his stock in said corporation, the other two shall, at his written request and with his assistance, take an account of the entire assets of the corporation, so that the correct value of the stock may be arrived at, and he shall thereupon offer his stock to the others at the price it is shown to be worth on the taking of said account, and thereupon the others shall purchase the stock of the one so requesting at said price, which shall be paid to him by them in cash within two months from the determination of said price.

"3. In case the parties hereto are unable to agree on the value of the assets of said corporation as provided for in the aforegoing paragraph, any matter or matters on which they are unable to agree shall be referred to the decision of three disinterested persons, one to be chosen by the party offering his stock for sale, another by the remaining two parties, and the third by the two so chosen; and, if either of said parties shall neglect or refuse to choose an arbitrator after such dispute has arisen and for the space of fifteen days after he is requested in writing by the other party to choose such arbitrator, then the other or others, as the case may be,

shall choose two disinterested persons, and the two so chosen shall choose a third; and the decision of such arbitrators, chosen in either of the manners above provided, or of any two of them agreeing, shall be final and binding upon all the parties hereto.

"8. This agreement and each of its provisions shall inure to the benefit of and be binding upon, not only the parties hereto, but also their several and respective heirs, executors and administrators . . . ."

The bill then sets out that such agreement remains in full force and effect at the present time; that no one of the parties thereto sold or otherwise parted with any interest in the whole or any part of his stock, and that from the date of its organization up to the death of complainant's intestate on January 10, 1937 the corporation in question engaged successfully in the business for which it was incorporated; that, following the death of her husband, complainant desired to sell the stock in said corporation held by her as administratrix of his estate, and to that end, and as to the method to be employed to bring about such result, conferred with the respondents; that she was informed by them that this matter was governed by the agreement in question; that not having a copy thereof, and being in ignorance of its provisions, she was then furnished with a copy of the above portions of the agreement by the respondents, who told her that they recognized it to be in force and that it set out the procedure to be followed in case of such a sale; and that on several other occasions after her husband's death the agreement was recognized as being in full force by the respondents, who made statements to that effect, and also as to its being binding upon the complainant in any effort she might make to realize upon the shares of stock in question.

In addition, it is asserted in the bill that, at one of such interviews between the parties, the respondents submitted to the complainant a statement of the assets of Cook-Dunbar-Smith Co. as of December 31, 1936, stating that the

only probable difficulty in carrying out the provisions of the contract would be in reaching an agreement as to the value of the company's real estate, which was carried on the books at an arbitrary value not based on an actual appraisal.

It is also alleged in the bill that, acting under the provisions of the agreement in question, the complainant on November 19, 1937 offered in writing to sell to the respondents all the shares of stock in the above-named corporation held by her as administratrix as aforesaid, requested an account of the entire assets of said corporation so that the correct value of its stock might be arrived at, and also expressed her desire to refer the matter to arbitrators in accordance with the terms of the contract, in case she and the respondents should not be able to agree upon a price for the stock; that under date of November 20, 1937 she received identical writings from each of the respondents offering to sell to her their respective stock; that on January 18, 1938 negotiations between the parties regarding the sale of the stock held by her having failed, the complainant, through her attorney, wrote the respondents asking them to name a disinterested person as arbitrator under the provisions of the agreement in question, and herself offered to appoint one, the third to be selected by the two arbitrators so named; that on January 20, 1938 the respondents chose an arbitrator and on the same date the complainant also named one; that on the next day the complainant called to the attention of the respondents' attorney by letter the fact that the arbitrator named by the respondents was not disinterested; and that on February 1, 1938 the respondents designated another person as arbitrator.

Finally, it is averred in the bill that the two arbitrators were unable to reach an agreement as to the naming of a third; that on June 28, 1938 respondents' attorney wrote complainant's attorney a letter which, among other things, expressed the opinion that the agreement of February 16,

1906, under the circumstances, had no binding effect and was not applicable to the respondents, and declined to proceed further under such agreement; that on July 2, 1938 the complainant's attorney wrote the two arbitrators requesting them to proceed immediately with the selection of a third in accordance with the agreement, so that an appraisal could be made; that on such date said attorney also notified the respondents' attorney of such request; that on July 7, 1938 the complainant's attorney received from the arbitrator appointed by the respondents a letter stating that at that time he respectfully declined to discuss the selection of a third arbitrator, or to proceed with the duties imposed upon the arbitrators under the agreement in question. The present bill of complaint was filed August 8, 1938.

We will first consider the respondents' appeal. They contend that the superior court was in error in overruling their demurrer to the bill. The grounds of this demurrer were, in substance, that, from the facts set out in the bill of complaint, the contract of February 16, 1906, upon which it was alleged the complainant's rights depended, was not applicable and afforded no basis for maintaining the bill, being lacking in mutuality and unenforceable; that it did not appear from said bill that the complainant was ever ready, willing and able to purchase the respondents' stock when offered by them to her; and that she breached her obligations under the agreement in question. A further ground of demurrer was that, even if such agreement was otherwise applicable, its enforcement was barred by the statute of limitations and by laches.

The contract set out in the bill of complaint is unusual and is not free from ambiguity. The complainant's construction of the contract raises a question as to its validity and as to its enforceability if the whole contract and all of its provisions are taken into consideration. If the complainant's claim to equitable relief rested merely on the inter-

pretation to be placed on the terms of such contract, without the aid of certain alleged facts, it might well become difficult to sustain the bill.

However, in construing a contract, the meaning of which is ambiguous and doubtful, the parties' own acts are very material as showing how they themselves have construed it. In this bill there are important allegations of fact as to such acts, and these, of course, are admitted by the demurrer. They relate to the conduct of the parties, in particular the respondents, in connection with the sale and purchase of the complainant's stock, and they also show the interpretation which the respondents themselves put upon the agreement. It is not necessary to restate in detail these allegations which have just been hereinbefore set out.

Viewed in this light the respondents, by admitting the facts as alleged in the bill, recognized the agreement as existing and valid, discussed with the complainant the valuation of the corporate assets in connection with the purchase of the stock held by her, and, in effect, made by their conduct their own interpretation of doubtful portions of the agreement. It is clear, therefore, that the bill is not based solely on the language of the agreement itself but, in addition, on the conduct of the respondents in connection therewith.

Taken together, the allegations of the bill show clearly that the business in question, though corporate in form, was actually a partnership and was so considered by the respondents and by the complainant's intestate. Thus, according to such allegations, the agreement, as interpreted by the conduct of the parties hereto, was apparently treated as one dealing in effect with the ordinary situation of two surviving partners purchasing, under certain specified procedure, the share of a deceased third partner.

Contracts of that general nature involving partnerships, and not unlike in certain respects the contract relied on here

by the complainant, have been held valid and enforceable and relief granted under them. *Kavanaugh* v. *Johnson*, 290 Mass. 587; *Onstott* v. *Ogle*, 234 Ill. 454; *Kaufmann* v. *Kaufmann*, 222 Pa. 58; *Bradford* v. *Gammon*, 1 Ch. (1925) 132. In the following cases, in which the businesses involved were corporate in form but were conducted essentially as partnerships, as in the instant cause, contracts of a like nature were recognized as good and were enforced. *Greater New York Carpet House, Inc.* v. *Herschmann*, 258 N. Y. App. Div. 649; *Bohnsack* v. *Detroit Trust Co.*, 292 Mich. 167; *Fleming* v. *Fleming*, 211 Ia. 1251. Further, it has been held that ordinarily mere lapse of time is no bar to the validity or enforcement of such contracts. Agreements of that nature have been construed as showing the intent of the parties that the contract be coextensive with their business association. *Normand* v. *Normand*, 11 A. 2d. 816 (N. H.). See also *Fitzsimmons* v. *Lindsay*, 205 Pa. 79; *Kingston* v. *Home Life Ins. Co.*, 11 Del. Ch. 258; *Scruggs* v. *Cotterill*, 67 N. Y. App. Div. 583.

The cases cited by the respondents, in support of their demurrer, in the main relate to contracts unlike the one set out in the present bill of complaint. This is particularly so when the instant contract is considered in connection with the manner in which, according to the allegations of fact made in the bill, the parties themselves, especially the respondents, interpreted such contract and acted under it. The cases relied on by the respondents deal chiefly with ordinary option contracts or so-called pre-emption contracts. If the agreement on which the present cause is based stood alone, to be construed merely from its express terms without the consideration of any further facts, then the respondents' contention that the agreement was merely a pre-emption contract would not be without some force and their authorities might be applicable.

We are of the opinion, however, that, because the facts alleged in the bill of complaint show the way the respondents

interpreted the agreement by their own acts, none of the grounds set out in the respondents' demurrer can be sustained. In consequence, we find that the decision of the superior court overruling such demurrer to the bill of complaint was correct, and that the respondents take nothing by their fifth reason of appeal.

The agreement having been determined to be binding on the parties and enforceable, none of them objected to going forward with evidence as to the correct value of the stock in question so that the trial justice might decide that issue. After hearing the evidence the trial justice made certain findings. Some of them were in substance as follows: That the three incorporators recognized, during the lifetime of complainants intestate, the validity of the contract of February 16, 1906; that after his death the two respondents recognized its validity as a contract of purchase and sale in the circumstances, as alleged in the bill, and that they had acted thereunder until June 28, 1938; that the said contract has been in full force and effect since its execution; that the complainant has in all things complied with the terms of the contract in respect to the sale of the stock held by her in her representative capacity as aforesaid, but that the respondents have failed to perform their part of the obligations of the contract as to valuing and purchasing the complainant's stock.

We cannot say that these findings of the trial justice, who saw and heard the witnesses testify, are clearly wrong. Therefore, we do not disturb them. In our opinion, the findings are supported by evidence showing the conduct of the parties to the contract during the lifetime of complainant's intestate, and by the conduct and statements of the respondents thereafter. Among other things, we may refer in particular to the latters' conduct and statements during negotiations after the death of complainant's intestate, especially in reference to the audit sheet of December 31, 1936, and to

the value of the real estate owned by the corporation; to the fact that the corporation carried life insurance payable to it upon the lives of the three stockholders, for the purpose of having money available toward the payment for a deceased stockholder's shares, if such a contingency arose, and that about $18,000 was thus paid the corporation after the death of Cook; and to the fact that the respondents, in the first instance, took steps to arbitrate under the agreement in question.

At the trial considerable evidence was introduced to enable the trial justice to "take an account of the entire assets of the corporation, so that the correct value of the stock may be arrived at." On this issue, as already indicated, he found such value to be $210,000. It is not necessary or feasible to review the evidence in detail here. The parties agreed upon November 19, 1937, at which time the complainant sent her written request to the two respondents concerning the sale to them of the stock held by her, as the date at which the correct value of such stock should be taken. The word "correct" is often considered as meaning "exact", and its common synonyms are "true" or "proper". In making his decision the trial justice decided that "correct value", as used in the agreement, could best be determined by ascertaining the fair or estimated market value of the stock, and reached his figures virtually on the basis of a transaction as to the stock between a willing buyer and a willing seller. Most of the opinion evidence of the expert witnesses was given on this same basis.

The respondents argue that the above method of determining "correct value", as used in the agreement, was erroneous, and that such value should be considered to be the value of the stock as between the interested parties only, viz., the sole owners of the business, having in mind the manner in which such business had been conducted by them. The respondents contend that the difference in the above two

methods is of importance, particularly in considering and weighing the testimony of those experts who based their estimate of the value of the assets of the corporation on the theory of capitalizing its earnings. This is because, in figuring its net earnings, the experts refused to allow in full as legitimate corporate expense the sums paid the three stockholders as salaries, as shown on the books of the corporation, but instead estimated reasonable salaries at a lower sum. The respondents argue that under such a procedure the complainant's intestate, who, in his lifetime, received the benefit of the sums charged as salary on the corporation's books, now has part of such salary figured into corporate net earnings to be used in estimating the value of his stock upon a capitalization of such earnings, thereby unduly penalizing them and improperly benefiting the complainant.

In our opinion, in view of all the facts and circumstances, the respondents' contention in this connection is convincing and correct and should have been followed by the trial justice. The evidence shows that while the three incorporators conducted the business in question under a corporate form, as between themselves they operated it as a partnership and dealt with each other as partners. The present proceeding is not to be governed by the rules, tests or formulae frequently employed in fixing corporate financial values, when the stock of the corporation under consideration is listed on the market or is in the hands of the public generally. This proceeding, on the basis of the allegations in the bill and the evidence in support thereof, in our opinion, should be treated substantially as an accounting upon the dissolution of a partnership, or as a compulsory purchase by surviving partners of a deceased partner's share following an accounting, as is provided for in many partnership agreements.

It appeared from the evidence that for approximately thirty years the three men who organized the business carried it on successfully, each contributing of his time and

efforts in its various phases, and together directing and managing the affairs of the corporation. The complainant's intestate up to the time of his death was president of the corporation, Dunbar was treasurer, and Smith was secretary, and they also made up the board of directors. The corporation did not retail its products, but dealt largely with persons in the optical trade. On November 19, 1937 the principal corporate assets consisted of cash, gold, machinery and equipment, inventories, accounts receivable, and land with a building thereon. The audit of December 31, 1937, which was the one nearest in time to the date in issue in the instant cause, showed from the balance sheet the book value of net assets to be $149,087.48.

To assist the court in arriving at the correct value of the stock of the corporation, the complainant placed on the stand three witnesses who qualified as experts in such matters, and who gave their respective opinions. Two of these witnesses based their opinions on a capitalization of the total net earnings of the corporation, including those from the building in question. Such a method is apparently recognized as proper when stock is not listed on an exchange and no sales are available to act as a guide. In determining such net earnings the matter of salaries paid the three incorporators became important. The evidence showed that for the years 1921 to 1937 inclusive, according to the corporate records, the total salaries paid to the officers amounted to $571,166.96, varying from $17,819.93 to $42,935.12 per year, whereas the profits before salaries during the same period were $595,887.89. One of these witnesses testified that in his opinion reasonable salaries for the officers should total $15,000 per year, and the other witness considered $12,500 per year proper. The respondent Smith gave evidence that $10,500 for himself and $10,900 for the respondent Dunbar would be reasonable yearly salaries under all the circumstances.

The first of the said expert witnesses, after deducting $15,000 per year for salaries, found, from the figures submitted in evidence, average net earnings of $16,000 per year over a period of ten years, which amount he capitalized, using 1 to 13 as the ratio, 3 of which were for good will, and fixed the value of the stock in round figures at $200,000. The second expert witness, after deducting $12,500 per year for salaries, found in the same manner average net earnings of $19,500 per year which he capitalized, apparently at the ratio of 1 to 11, making no reference to good will, and fixed the value of the stock at $214,500.

The complainant's third expert witness separated the manufacturing operations and proceeds from the real estate and the income derived therefrom, and placed a value on the stock based only on earnings from manufacturing operations, without taking into consideration in any way the earnings from the real estate. In reaching his opinion this witness employed a test based on a comparison between the earnings and the market prices of the stocks of allegedly comparable companies in order to reach a capitalization rate to be used in the instant cause. The witness first determined that over a ten-year period $13,943 per year fairly represented the cost of management or executive salaries for the Cook-Dunbar-Smith Co. Then he capitalized what he found to be the average net earnings of such corporation over different parts of a ten-year period, after reaching rates by considering figures, as aforesaid, from a number of companies which, in his judgment, met certain requirements so that they could properly be considered to be comparable. After so doing he came to the conclusion that the stock of the Cook-Dunbar-Smith Co. on November 19, 1937 was worth $112,343, exclusive of the real estate.

Some of the testimony given by the said three witnesses was admitted over the objection of the respondents, who contended that it was not material and that the proper foun-

dation for its admission had not been laid under the facts and circumstances of this cause. However, assuming that the evidence was properly admitted, we are of the opinion that, in the final analysis, it had no value or applicability in the determination of the questions before the court. These witnesses attempted to estimate the value of the stock by using the test of capitalization of corporate net earnings. This is undoubtedly a recognized method of ascertaining such value, provided the facts of the situation warrant, and if a proper basis exists upon which the capitalization can be made.

In our opinion, however, such facts and such bases were not established in the instant cause. In the first place, the evidence shows clearly, as we have pointed out, that, though there was here a corporate structure in form, actually the business was a partnership; and the agreement here was not between the corporation and the stockholders, but between the stockholders themselves as individuals. Second, to apply here the rule of capitalizing net earnings, the evidence ought to show the existence of significant net earnings over a period of years. Otherwise the result would probably be unjust to the complainant. But, as shown on the books and records of the business, there were no such significant net earnings over a period of years.

To obtain such net earnings, as a basis for applying that rule, it was necessary for the three witnesses to more or less arbitrarily cut down the salaries which the officers, who were also the sole stockholders, had been receiving over a period of years under their mutual agreement. This was done on the theory that such salaries were unreasonably large. Moreover, they were treated by the expert witnesses as purely "executive salaries". The evidence in the cause, however, showed that the three men, operating the business virtually as partners, performed valuable services in other departments which mere executives in such a business ordinarily do not perform, but which have to be otherwise paid for.

Further, it did not appear that said witnesses had had any personal experience in or knowledge of the kind or type of business under consideration upon which to base their opinions of proper salaries in the circumstances. Their opinions were based on alleged general knowledge or on certain theoretical computations. In view of the fact that the evidence in this cause showed that the business under consideration was a very closely held corporation, which was in effect conducted as a partnership, large corporations with many stockholders do not appear to us to be reasonably comparable to such a business for the purpose of valuing its stock, although certain of the experts made use of such corporations in order to arrive at their opinions. In our judgment, it was not shown that the witnesses in question were qualified, under the facts appearing in evidence, to more or less arbitrarily determine that the amounts which the three incorporators had been receiving were not properly chargeable to salaries.

In addition, it may be noted that the agreement itself in clause 6 contains the following provisions as to salaries: "After said period of two years, the salaries of said Cook, Dunbar and Smith shall be equal. Subject to the above agreement, the salaries shall be as mutually agreed by and between the parties hereto." In other words, as between themselves, the salaries were to be as the parties agreed, and the evidence shows that such salaries were always paid by mutual agreement. It is difficult to perceive how the complainant, who merely represents her husband's estate, can now successfully question, when attempting to enforce other provisions of the agreement, the matter of salaries paid in the past, under an express clause thereof, to the three officers, one of whom was her husband. As far as she is concerned, the agreement is the basis of her suit, and she cannot be allowed to disregard any language of the contract upon which she is relying to obtain the relief she is seeking. We conclude, therefore, that under all the circumstances ap-

pearing herein, and for the reasons indicated, the trial justice, in coming to his decision, should have disregarded the opinion evidence of the three expert witnesses offered by the complainant.

An expert witness, who testified on behalf of the respondents as to the value of the stock, declined to go back of the year 1931 in considering the figures because of change in business conditions since that date. For his purpose he included the officers' salaries as they appeared on the records of the corporation and, after so doing found that net earnings were insignificant for the purposes of capitalization. By examination, however, he determined that on November 19, 1937, the market value of the stock of certain corporations, hich he deemed in some particulars fairly comparable to the Cook-Dunbar-Smith Co., averaged about two-thirds of the amount of their book value and net quick assets. Applying this formula to the book value of the corporation under consideration, as such value was set up on its audit of December 31, 1937, he gave it as his opinion that the value of the stock of the Cook-Dunbar-Smith Co., on the date material in this cause, was $100,000. The complainant disputes the opinion of this witness on several grounds. The trial justice stated in his decision that, in his judgment, the basis of valuation adopted by this witness was inapplicable to the instant cause. In this view we agree with the trial justice.

The only relevant and competent evidence of value, therefore, appearing in the cause, and which, in our judgment, should have been considered, is that furnished by the records and audits of the corporation. The latter are in evidence, covering a considerable number of years, and appear to have been systematically and accurately made. Undoubtedly, the complainant's intestate during his life rendered assistance in their compilation and had full knowledge of the figures arrived at. These records were kept and the audits made in the same general way for many years. In

that connection no question of fraud, bad faith, concealment or overreaching on the part of any of the incorporators has been raised, or even suggested.

Further, there is certain language in the agreement from which it may well be argued that the parties thereto intended such records and audits as the basis to be used in arriving at the correct value of the stock, if it later became necessary to fix such value. This language is as follows, and appears in clauses 2 and 3 of the agreement: "2. After said three (3) years, if any one of said parties wishes to sell his stock in said corporation, the other two shall, at his written request and with his assistance, take an account of the entire assets of the corporation, so that the correct value of the stock may be arrived at . . . . 3. In case the parties hereto are unable to agree on the value of the assets of said corporation as provided for in the aforegoing paragraph . . . ."

It becomes necessary, therefore, to consider the audit of December 31, 1937, which is the one nearest in time to November 19, 1937, the date in issue in this cause. This audit shows from its balance sheet, in the statement of assets and liabilities, capital stock and surplus, a net book value of $149,087.48. Of course, book value as set up on a corporation's book is not conclusive evidence of the value of the stock of the corporation. The figures used to make up such book value are largely under the control of the officers of the corporation. In the instant cause, however, the various items making up the balance sheet are readily capable of ascertainment owing to the nature of the business, and no complicated accounting is involved. Moreover, it appears that the accuracy of the figures appearing in the balance sheet of the audit is not questioned except in one instance. That relates to the value at which the real estate is carried on the books of the corporation. The complainant attacks the correctness of that item. The audit shows that the land is valued at $10,800 and the building thereon, after depreciation, at $50,024.58, a total of $60,824.58. The evidence shows

that in recent years the corporation has been depreciating such building at the rate of about $1400 per year.

The parties introduced opinion evidence as to the value of the land and building owned by the corporation. The evidence showed that the land comprises about 23,000 square feet abutting on three streets, and that the building is of mill construction four stories in height and contains approximately 47,600 square feet of floor space. There is a wooden shed on the lot and the building proper has several small additions. It is situated in an outlying part of the city of Providence in the neighborhood of several other manufacturing establishments. The building was erected in 1892 and was purchased, together with the land upon which it stood, by the Cook-Dunbar-Smith Co. in 1924 for $90,000. In 1937 it was structurally in a reasonably good condition, but needed certain specified repairs, and had become somewhat obsolete. The audits indicate that it was insured by the corporation against fire in the sum of approximately $75,000.

The Cook-Dunbar-Smith Co. occupies the first floor and leases the remainder of the space in the building to several tenants, but not under written leases. During the eleven-year period from 1927 to 1937 the rents per square foot had varied in amount, and part of that time the corporation had not charged itself as much per square foot as it did the tenants. It also sold power to its tenants, thereby deriving an added income. Over the said eleven-year period the average net income yield of the building from rents to the Cook-Dunbar-Smith Co., after depreciation and adjustment of their own rent, was approximately $5,800 per year. During the same period the average net income from the sale of power was about $4,500. In other words, the building returned to its owners, from both sources, substantially $10,000 net per year average over the eleven years in question.

Two witnesses testified for the complainant, having qualified as experts, as to their opinion of the value of the said

property. One of these witnesses stated that in his opinion the property, on November 19, 1937, was fairly valued at $100,000, allowing a reasonable time for a willing buyer and willing seller to agree. The other witness placed the value at between $90,000 and $100,000 under the same general conditions. Both of these witnesses, in coming to that opinion, emphasized strongly the favorable income derived from the building in question, although they stated that they did not rely entirely on that feature of the situation, but also took the location, history, and other circumstances about the building into consideration. They both admitted that sales of comparable property were a satisfactory test of value, but found no such sales readily available for use.

Two witnesses of a like character testified on behalf of the respondents. One of these estimated the value of the property in question to be $51,000 and the other to be $52,000 on the above-mentioned date, as between a willing buyer and a willing seller with time to negotiate. One of these witnesses gave practically no consideration, in arriving at his opinion, to the income derived from the building. The other witness took the income into account to some extent, but not as a basis for his opinion when he discovered that the tenants had no leases. Both these witnesses relied largely on prices received in recent sales of other properties, which they considered reasonably comparable, in particular, one known as the Mason Can Company building. The complainant argues strongly, and in our judgment with some force, that many of the properties considered by these witnesses to be reasonably comparable to the Cook-Dunbar-Smith Co. property could not fairly be so considered because of vital differences.

After weighing all the evidence on this issue, the trial justice found that on November 19, 1937 the fair market value of the real estate was $95,000. Upon careful consideration, we have come to the conclusion that he was clearly wrong

in fixing the value of the real estate at that figure. It is our opinion, after examining the evidence, that such amount, under all the circumstances appearing herein, is too high. In our judgment, too much emphasis has been placed upon the somewhat unusual income derived by the corporation from the building. Although it appears that a substantial income from this source has been received for a number of years, it may reasonably be questioned whether or not such income can be depended upon to continue in approximately the same amount. Business conditions often bring rapid changes. Of course, the income so received must be given careful consideration by anyone attempting to fix the fair value of the real estate, and we have attempted to give the matter such consideration in coming to our decision.

However, it seems doubtful, considering the nature of this proceeding and its object, whether or not it is proper to view the real estate purely as an investment which yields an unusually good return. This is apparently what the complainant's expert witnesses did. It seems unreasonable to believe, that if the land and building were bought by the corporation in 1924 for $90,000, not at a forced sale but when the real estate market was better than it was in 1937, they were fairly worth $95,000 in the latter year, the building being then thirteen years older and in the condition described in the evidence. There was no testimony that the value of the land alone had increased since 1924. The records of the corporation tend to show that the interested parties themselves, including the complainant's intestate, did not place as high a value on the real estate as did the trial justice.

Realizing the great difficulty of estimating the fair value of the real estate in question, on the evidence presented, we have, nevertheless, after careful consideration, come to the conclusion that the sum of $71,467.20 is a fair and reasonable approximation of such value rather than the figure of $95,000. In arriving at the above amount of $71,467.20

we have kept in mind all the material facts and circumstances appearing in evidence, and have taken into consideration sales of other properties fairly comparable with the Cook-Dunbar-Smith Co. property, as well as the income received from the latter, remembering, however, that none of the tenants are bound by leases. Further, the figure we have determined upon is reasonably in line with the amount of fire insurance carried on the building by the corporation. Finally, taking the purchase price of the building alone in 1924, as carried on the books of the corporation before depreciation, *viz.*, $79,200, the depreciated value in 1937, based on the entire life of the building as shown by the evidence, would be approximately $60,667.20. To this should be added $10,800, the value of the land, making on that basis a total of $71,467.20 for the property in 1937.

Adding to the book value of the corporation, as appearing on the audit of December 31, 1937, *viz.*, $149,087.48, the sum of $10,642. 62, which, in our judgment, represents the amount which is necessary to bring the value of the real estate to approximately its correct figure at the above date, the total proper book value would then be $159,730.10. Making allowances for any reasonable adjustments, we find that the correct value of the stock of the Cook-Dunbar-Smith Co. on November 19, 1937 was $160,000, and that the trial justice was in error in fixing it at $210,000. One-third of such correct value, namely, $53,333.33 is due the complainant from the respondents under the agreement in suit.

The trial justice allocated no part of his finding specifically to good will. We deem the evidence in the cause on that point to be too indefinite, uncertain and speculative for us to be able to fix any value for such element, even assuming that under the circumstances it is proper to do so. In view of the fact that we have made use of book values in disposing of this cause, it becomes unnecessary to discuss the respondents' argument in connection with the mortgage

on the real estate, since such mortgage appears in the balance sheet of the corporation.

The trial justice allowed interest from the date of his decision, namely, July 27, 1939, on the sum he adjudged to be due the complainant. He decided that he had power to work out an equitable result in that connection. 1 Restate. of Law Contracts, 547, § 337. The complainant, however, contends that she should be allowed interest from an earlier date, either two months after November 19, 1937, by reason of her construction of a provision of the agreement, or from the date of the filing of the bill of complaint, August 8, 1938. The respondents, on the other hand, maintain that no interest at all should be allowed the complainant.

The amount to be received by the latter has at all times been unliquidated and up to now undetermined. Even though apparently the arbitration failed to a certain extent by reason of the conduct of the respondents, it would appear that such conduct was taken on advice of counsel and not in bad faith, but to litigate a disputed question. The complainant at all times has held her intestate's stock. The present proceeding under the circumstances takes the place of the arbitration, and it may be noted that the original agreement between the parties provided in substance that, after the arbitrators had determined upon the price, the money was to be paid within two months from such determination. Under that provision, and in view of all the circumstances, we are of the opinion that interest should run only from a date which will be two months next after the date of the entry of the decree in accordance with this opinion.

We find nothing in the rulings of the trial justice in connection with the admission or exclusion of evidence which requires further comment.

The respondents also object to the inclusion in the final decree of the ninth paragraph thereof, wherein it is provided

that the complainant may "institute and prosecute any other and further proceedings to collect and enforce payment of the sums hereby adjudged to be payable and herein ordered to be paid by the respondents, which the complainant may be entitled to institute or prosecute, either in law or in equity, and the complainant may apply further to this Court if occasion shall require."

In our opinion the respondents' objection has merit. It is not clear in all respects just what the purpose of this paragraph is. However, it is apparent that it relates to some matter in the future which has not been adjudicated as an issue in this cause, and which may never arise. In our opinion, therefore, the paragraph in question should not be inserted in the final decree.

The complainant's appeal is denied and dismissed, and the respondents' appeal is sustained. The parties may, on March 21, 1941, present for our approval a form of decree, in accordance with this opinion, for entry in the superior court.

*Tillinghast, Collins & Tanner, Harold E. Staples, George C. Davis,* for complainant.

*Charles E. Tilley, Marshall Swan, Eugene J. Phillips, Swan, Keeney & Smith,* for respondents.