JOHN F. DAVIS COMPANY *vs.* THE SHEPARD COMPANY.

JUNE 11, 1946.

PRESENT: Flynn C. J., Moss, Capotosto, Baker and Condon, JJ.

CONDON, J.   This is a bill in equity for the removal of the respondent as trustee under a lease and for incidental relief. After a hearing in the superior court on bill, answer and proof, a final decree denying and dismissing the bill was entered, and from that decree the complainant has appealed.

The appeal raises the question whether parol evidence was admissible to explain the meaning of the word "fuel" in the third clause of the lease, and also whether the installation of a new master service panel was an improvement in the leased premises for which, under the seventeenth clause of the lease, complainant was liable to pay 85% of the cost.

The pertinent provisions of those clauses are as follows: "Third: The Lessor shall furnish free to and for the use of the Lessee in connection with the use and occupancy of the premises, herein demised, electric power, electric light, heat, electric light bulbs . . . . (a) The Lessee shall pay for all gas or fuel used in the preparation of food, and it is agreed that a separate gas meter shall be installed to determine the gas

to be paid by the Lessee: and in the event that the Lessee decides to install an electric range, a separate meter shall be installed for the purpose of determining the electricity used for this range, and the Lessee shall pay for the electricity as shown by this special meter; the Lessee shall pay to the Lessor for such gas or fuel (and electricity if such range be installed) as the Lessee is obligated to pay for under this lease, as the Lessor pays for same. (b) If said Lessee installs an air-conditioning system, the Lessor and the Lessee shall each pay one-half (½) of the cost of the electricity for the operation of the same, to be determined by a separate meter installed for that purpose."

"Seventeenth: That the Lessee will from time to time make improvements in the said premises and install fixtures and equipment, and the Lessee shall furnish plans and blue prints at its own expense to the Lessor therefor, said improvements, fixtures and equipment and any changes in said premises to be subject to the approval of the Lessor, and the Lessor hereby agrees with the Lessee to contribute fifteen percent (15%) of the cost of any Physical improvements, fixtures and equipment installed in the said premises up to and within sixty (60) days from the date of the opening of the Tea Room for business, provided, however, that if the Lessee installs an air-conditioning system, said Lessor shall contribute fifteen percent (15%) of the cost thereof without regard to the said sixty day period."

The respondent, The Shepard Company, formerly conducted a restaurant on the leased premises in connection with its department store in an adjoining building. By the terms of the lease the complainant, John F. Davis Company, took over the restaurant on its own responsibility but agreed to operate it as if it were a department of the Shepard store and to permit the respondent, as trustee, to collect all the receipts of the restaurant, with the *proviso* that the latter should first pay therefrom all salaries and expenses of operation of the restaurant, deduct 10% of the gross receipts as

rental of the premises and then pay over the remainder to the complainant each month.

The complainant, before opening the restaurant, installed, at great expense, new improvements, fixtures and equipment, including some new electric appliances for preparing food, but not an electric range. These appliances were in addition to or in substitution for other such appliances which respondent had used in the restaurant. After the restaurant was in operation respondent claimed that these new appliances required a greater load of electric current than was required for the electric equipment which it had formerly used in its operation of the restaurant. However, in order to service adequately the new electric equipment in the leased premises, the respondent installed a new master service panel. After the restaurant was opened and the respondent had collected the receipts of operation, it deducted therefrom a sum to cover the cost of the electricity which it estimated the complainant had used in the preparation of food. It also deducted $653.19 as complainant's share of the cost of the master service panel. Complainant objected to both deductions and claimed that they were in violation of the express terms of the lease.

Was the deduction to cover the estimated cost of the electricity which was used in the preparation of food authorized by the terms of the agreement in the lease? Complainant contends that it was not, because under the provisions of the third clause respondent was bound to "furnish free" all electricity used on the leased premises. Respondent contends, however, that by virtue of subclause (a) complainant was obliged to "pay for all gas or fuel used in the preparation of food" and, therefore, it was liable for the cost of the electricity which it used for such purpose. Complainant urges that the word "fuel" does not include electricity and hence respondent's contention is without merit. In the superior court the respondent was allowed, over the objection of the complainant, to introduce evidence tending to prove that there was a usage in the restaurant business by which elec-

tricity used for cooking was understood to be included under the word "fuel". Complainant argues here that it was error to admit such evidence as the third clause is, on its face, clear and unambiguous and, therefore, no evidence *dehors* the writing is admissible to contradict or vary its express terms.

The cardinal rule of construction of contracts is to seek first the intention of the parties. But this court has said that such intention is to be deduced from the language of the contract, and that where it is unambiguous the terms of the contract are, in the absence of averment or proof of mistake, conclusive. The true question, the court has said, is " 'not what intention existed in the minds of the parties, but what intention is expressed by the language used.' " *Providence Ice Co.* v. *Bowen,* 44 R. I. 173, 182. And the court further said in that case: " 'Where the contract evidences care in its preparation, it will be presumed that its words were employed deliberately and with intention.' " This standard of interpretation of the ordinary contract has, as far as we are aware, never been departed from in this state. *Wholey Boiler Works* v. *Lewis,* 45 R. I. 441; *Butler Exchange Co.* v. *Fess Rotary Oil Burner Co., Inc.,* 125 A. (R. I.) 360; *Sutcliffe* v. *Pawtucket Amusement Co.,* 51 R. I. 493; *Cochran* v. *Lorraine Mfg. Co.,* 52 R. I. 17; *Allen* v. *Perrino,* 55 R. I. 353.

That standard of interpretation is variously referred to by some text writers as the popular, general, or normal standard, as distinguished from what is called the standard of limited or local usage. 9 Wigmore on Evidence (3d ed.) 185, §2460; 3 Williston on Contracts (Rev. ed.) 1731, §603; 1 Rest. Contracts 306, §227. Wigmore and Williston both disapprove applying the normal standard even to an integration which is expressed in language free from ambiguity, and the latter, at page 1740, §607, lays it down that, "According to the weight of authority and on principle, where the parties have assented to a writing as an expression of their agreement, or where a writing is required by law, the standard of interpretation is the standard of limited usage, that is, the ordinary meaning of the writing to parties of the kind

who contracted at the time and place where the contract was made, and with such circumstances as surrounded its making." This is also the view of the Restatement, p. 310, §230, although there the standard is expressed in different language and in somewhat more detail.

Wigmore refers to this standard as the liberal rule and says that it is conceded practically everywhere today "to permit resort in any case to the *usage* of a *trade* or *locality*, no matter how plain the apparent sense of the word to the ordinary reader". 9 Wigmore on Evidence 204, §2463. But he later observes that it is. "a question for the particular case whether the parties have in fact spoken according to that standard." *Idem* 208, §2464. And in the Restatement it is stated that if in the light of the surrounding circumstances it appears that the parties did not contract with reference to the usage, it is not applicable. 1 Rest. Contracts 350, §247, comment d. See also 3 Williston on Contracts 1893, §656.

This qualification of the applicability of the local standard of interpretation of a contract is well illustrated by the reasoning of the court in *North Shore Improvement Co.* v. *N. Y. P. & N. R. Co.*, 130 Va. 464. There the court rejected the local standard saying, "it is immaterial how general and universal the usage may have been as to cars consigned to Norfolk, or what knowledge the plaintiff may have had thereof, the usage is eliminated as a part of the agreement of the parties, because the contract of the parties (the bill of lading) called for delivery of the car at a particular siding in the city of Norfolk. The contract is in conflict with the usage, if otherwise applicable, and overrides it." Another like example is found in the opinion of *Blackburn, J.,* in *Myers* v. *Sarl,* 3 E. & E. 306, wherein he said, "when it is shewn that a term or phrase in a written contract bears a peculiar meaning in the trade or business to which the contract relates, that meaning is, prima facie, to be attributed to it, unless, upon the construction of the whole contract, enough appears, either from express words or by necessary implica-

tion, to shew that the parties did not intend that meaning to prevail." See also *Baxter* v. *Lincoln Mills Co.,* 70 R. I. 16, 26, where this principle was applied in construing an oral agreement.

The local standard of interpretation as thus limited in its application to a written contract is not in conflict with the general standard which this court has always applied in the construction of ordinary contracts expressed in clear and unambiguous terms, but is, as observed by *Lord C. J. Tindal*, in *Attorney-General* v. *Shore*, 11 Sim. 592, rather in the nature of a corollary to the general rule. While no case in this state directly in point has been found, it would seem that from certain language in the opinions of this court in *Evans* v. *Commercial Mutual Ins. Co.*, 6 R. I. 47, and in *Wesley* v. *Cartier & Sons Co.*, 30 R. I. 403, it has always been assumed that the local standard of interpretation would be applied if the circumstances of a particular case called for its application. We are, therefore, of the opinion that it would be proper to admit evidence of usage in the restaurant trade as to the meaning, in the instant lease, of the word "fuel" if the circumstances here called for its application and the usage, if proved, would not vary or contradict the agreement of the parties appearing from express words in the lease or by necessary implication.

The parties to the instant lease are both conversant with the restaurant business. Respondent had conducted this restaurant and the complainant is and for a long time has been conducting restaurants in several cities in other states. Before finally integrating their agreements in the instant lease several drafts were submitted to complainant for its approval. Finally the draft now before us was approved and duly executed. It is an elaborate document and goes into meticulous detail concerning the mutual rights and obligations of the parties. It is fair to say that, as far as human foresight could extend, nothing, in the drafting of it, was intended to be left to chance or speculation.

The executed lease is and was intended by the parties to

be a complete memorial of the several agreements therein contained. In so far as the use of electric equipment in the restaurant was concerned both parties were aware of such use. Respondent had used such equipment in its conduct of the restaurant and it was specifically provided in the lease that the complainant could make use of existing equipment or could with the prior approval of the respondent, use new equipment to be installed by complainant very largely, but not wholly, at its own expense. These terms were complied with by the complainant. The new electric equipment which was installed by the complainant was approved by the respondent before the restaurant was opened for business.

Respondent, with the knowledge that such new electric equipment was installed, permitted the restaurant to open notwithstanding that there was no separate electric meter to measure the amount of electricity which the complainant would use in preparing food. After noting the amount of electricity which was being used in the leased premises, respondent apparently estimated the amount allocable to the equipment which complainant was using in the preparation of food and deducted a sum from the gross receipts of the restaurant to cover the cost of such electricity. How that allocation was determined, in the absence of a separate meter, the record does not disclose.

In the light of those circumstances it is clear from a reading of the third clause of the lease that the parties did not intend to be bound by a usage of the restaurant business, if there was any such usage, that electricity, when used in the preparation of food, was deemed to be fuel. On the contrary, a fair reading of that clause shows an entirely different intention. By the very first sentence thereof respondent obligates itself to "furnish free to and for the use of the Lessee in connection with the use and occupancy of the premises, herein demised, electric power, electric light, heat, electric light bulbs . . . ." If the clause ended there, respondent certainly would be absolutely bound to furnish free all electricity used on the premises. But respondent contends that

such obligation is limited by subclause (a) which requires the complainant to "pay for all gas or fuel used in the preparation of food . . . ."

If this were all of that subclause, there might well be some merit in the respondent's contention that it was proper for it to show that the contract there uses the word "fuel" in a special customary sense peculiar to the restaurant trade; but the clause does not stop there. It goes on to refer specifically to the use of electricity. Apparently the parties considered the possibility that complainant might desire to use electricity to such an extent in cooking that the respondent would not want to furnish it free; so they expressly agreed that, in the event that complainant decided to install an electric range, "a separate meter shall be installed for the purpose of determining the electricity . . . as shown by this special meter". If respondent intended that complainant should pay for the electricity used in other electric cooking appliances, obviously it would have provided, as above, for separate metering, as in no other way could complainant's share of the cost of the electricity used on the premises in cooking be accurately computed. That this fact was recognized by the contracting parties is further evidenced by the language of subclause (b), wherein a separate meter is also expressly provided for in the event complainant installed an electrically operated air-conditioning system.

That the third clause contemplates electricity separate and apart from the word "fuel" is finally emphasized by the concluding part of subclause (a), which states in part "the Lessee shall pay to the Lessor for such gas or fuel (and electricity if such range be installed) . . . ." Only on the view that the parties expressly contracted as to when the complainant should be charged for electricity do the words in the parentheses have any meaning. The true meaning of the whole clause is that the parties contracted specially with reference to when the complainant's use of electricity would obligate it to pay the cost thereof and absolve respondent from its covenant to furnish it free. On this construction

parol evidence to show a usage was inadmissible as its only purpose would be to alter or contradict the express contract of the parties which clearly shows that they did not intend to adopt such usage.

This brings us to the next question whether, under the seventeenth clause, respondent had the right to charge to the complainant 85% of the cost of installing the master service panel. That clause provides that the complainant, at its own expense, shall, with the approval of the respondent, make improvements in the leased premises, first furnishing respondent with plans and blueprints thereof. The panel, however, was installed by the respondent and not by the complainant. There was evidence tending to show that complainant, through its architect, requested its installation as necessary to service the additional load of electric current required by the improvements in the leased premises. The trial justice found that this panel was an improvement within the meaning of the clause and that complainant was obligated to pay its share of the cost thereof in accordance with that clause.

Complainant contended that the panel was not an improvement within the meaning of that word in the lease. We disagree with this contention and agree with the trial justice. Complainant further contended that the panel was not in the leased premises and, therefore, under the terms of the lease, it was not obligated to pay any part of the cost thereof. If such were the fact this contention would have merit, but we find nothing in the record to prove that fact. In some parts of the transcript there is testimony from which an inference might be drawn that this panel was not on the leased premises, but there is also other testimony of record from which a contrary inference might be drawn. Complainant offered no evidence that the panel is not on the leased premises, and its bill of complaint, on which it rested in the superior court, assumes that the panel is located there. In these circumstances we are of the opinion that the trial justice did not err in resolving the conflicting evidence on

this point in favor of the respondent and holding that the complainant was obligated to pay its proportionate share of the cost of the panel in accordance with the seventeenth clause.

For the reasons above stated, complainant is equitably entitled to the funds which the respondent has withheld to pay for electricity which complainant used in preparing food and the respondent is entitled to retain the sum which it withheld to pay complainant's share of the cost of installing the new master service panel. In so far as the prayer for the removal of the trustee under the lease is concerned we are of the opinion that no cause has been shown for such removal. The controversy which arose between the parties being one solely of the proper legal construction of the lease, and there being no evidence of bad faith or other inequitable conduct on the part of the respondent, grounds for supplanting it as trustee and appointing another are entirely lacking. Nor do we think it necessary at this time that the respondent be enjoined from withholding any further sums of money from the complainant. We assume, from the arguments before us, that the respondent will henceforth abide by the terms of the lease as we have herein construed them.

We are also of the opinion that the trial justice did not err, on the evidence before him, in not granting the complainant's tenth prayer for the appointment of a master to state an account between the parties.

The complainant's appeal is sustained, the decree appealed from is reversed in part, and the parties may, on June 19, 1946, present for our approval a form of decree, to be entered in the superior court.

*Donald A. Kingsley, Everett D. Higgins, William B. Sweeney,* for complainant.

*James L. Taft,* for respondent.