286 A.2d 249.

DAVID H. FLANAGAN *vs.* KELLY'S SYSTEM OF NEW ENGLAND, INC.

JANUARY 17, 1972.

PRESENT: Roberts, C. J., Paolino, Powers and Kelleher, JJ.

KELLEHER, J. This is an appeal by the plaintiff, sometimes hereafter referred to as "Flanagan," from a judgment entered in the Superior Court after a jury-waived trial denying and dismissing his complaint. The record of this appeal gives one a bit of an insight into what has become a phenomenon in our country, the so-called fast-food franchise.

Franchising is an arrangement whereby the franchisor who has developed a successful retail product extends the right to engage in the business to his franchisees. For this right, the franchisee usually pays to the franchisor an initial sum plus a percentage of the gross or net income realized on the sale of the product. The fast-food franchisor has a specialty such as doughnuts, or fried chicken, or roast beef sandwiches, or hamburgers which he offers as part of a package deal to the franchisee. Other parts of the package usually include a mutually acceptable site together with a building, business training and counselling and, last but not least, an operating manual. The manual in the case at bar covers such miscellany as directions for the preparation of hamburg, a suggestion that lime milk shakes be served on St. Patrick's Day and a recommendation

that the franchisee become an active member of the civic and fraternal groups in his area.[1] The fast food involved in this appeal is a fifteen-cent hamburger advertised as "Kelly's Hamburgers."

The record shows that prior to August 4, 1964, Flanagan was employed as a "site man" for a group which we shall refer to as Kelly's-Florida. This group had the exclusive right to build and franchise the operation of a chain of drive-in restaurants throughout the entire eastern part of the United States. Flanagan's job was to travel the territory seeking sites which would be choice locations for a Kelly Drive-In unit. It was explained to the trial court how a decision on a site would be reached only after a considerable study of such factors as the area's business potential, zoning laws, and traffic patterns. Once a site was approved, the franchisor would usually enter into negotiations with the site's owner whereby the owner would build the restaurant and lease it back to the franchisor who would, in turn, sublease it to the franchisee. The plaintiff was described as an "individual contractor" or an "employee" who was paid $3,000 for the efforts he had expended in obtaining a site that was ultimately approved by the franchisee. The $3,000 commission was in fact the initial franchise fee paid the franchisor from the franchisee. As of August 1964, there were five Kelly Drive-Ins located in New England. Three were in Rhode Island. Another was in New London, Connecticut and the fifth was situated in Lowell, Massachusetts.

On August 4, 1964, Kelly's-Florida sold its right to grant franchises in New England to a newly formed Rhode Island corporation which we shall refer to as Kelly's-Rhode Island. The principals of Kelly's-Rhode Island held the franchises for the three drive-ins located in this state. The sales agree-

---

[1]For a current view of franchising and its problems, see Brown, *Franchising—A Fiduciary Relationship*, 49 Tex. L. Rev. 617 (1971).

ment containing the various undertakings and promises of both the seller and buyer is part of the record. It has provisions assigning to the buyer all of the seller's interest in the five franchises in New England.

Section 2 of the agreement is entitled "Assumption of Existing Liabilities." It contains three subsections. In the first two subsections, Kelly's-Rhode Island agreed "to assume and pay" moneys due Flanagan and a Mark Segal, respectively, for work performed in connection with the New London drive-in. The third portion of this section gives rise to this litigation and it reads as follows:

> "(c) In the event the present operators of Kelly's units at Lowell, Massachusetts and New London, Connecticut, open new Kelly's units within one (1) year from July 1, 1964, then Purchaser agrees to turn over to David Flanagan, the Three Thousand ($3,000.00) Dollars franchise commission on each of said units, which will be payable upon Purchaser entering into a new franchise agreement with said operators. It is further agreed that in the event new units are opened, as aforesaid, the first of said Three Thousand ($3,-000.00) Dollars franchise commissions shall be payable Fifteen Hundred ($1,500.00) Dollars to the said David Flanagan and Fifteen Hundred ($1,500.00) Dollars to Deloris M. Allen, representing a loan made by the said Deloris M. Allen to David Flanagan."

It is undisputed that during the one-year period described in this section, Lowell Enterprises, Inc. built and opened two new roadside restaurants in the Lowell area. Its president conceded that on August 2, 1962, he had signed a franchise agreement with Kelly's-Florida which obligated the Massachusetts franchisee to pay a $3,000 fee for each additional unit it opened in the Lowell area. He told the trial justice that the advice and consultation service called for in the 1962 agreement never materialized. This official described the communication gap that developed between the Florida franchisor and his company. He insisted that

his company was never furnished with an operating manual and that about the only written advice it received was a formula for hot dog relish written on the back of a business card by an engineer employed by Kelly's-Florida. This witness also emphasized that he picked out the sites for the new drive-ins without any help whatever from his franchisor. Consequently, he felt that no additional franchise fees were due either Kelly's-Florida or Kelly's-Rhode Island.

The treasurer of Kelly's-Rhode Island reported that when he learned of the two new units, he asked the Lowell operator to pay the fees. He described his unsuccessful efforts in this regard by saying "[I] can't collect from a dead horse."

Simply put, the issue before us is: What is the extent of the obligation of Kelly's-Rhode Island in the light of its agreement "to turn over" to Flanagan the commission payable to him because of the two additional units in the Lowell area? Flanagan construes the term "turn over" as meaning that it was the obligation of Kelly's-Rhode Island to take all the steps necessary to insure the collection of his commission including the institution of legal proceedings against the Massachusetts operator. Kelly's-Rhode Island takes the position that you cannot "turn over" what you do not have and we agree.

The contract contains a clause calling for the use of Florida law in the event a dispute arises relative to the construction of the terms of the agreement. This stipulation gives us no concern because the rule is well-established both in Florida and this state that the clear and unambiguous language in a written contract is controlling as to the intent of the parties and thus governs the legal consequences of the contract provisions. The intent we seek is not some undisclosed intent that may have existed in the minds of the contracting parties but the intent that

is expressed by the language contained in the contract. *Gendzier* v. *Bielecki,* 97 So.2d 604 (Fla. 1957); *Hamilton Constr. Co.* v. *Board of Public Instruction,* 65 So.2d 729 (Fla. 1953); *Lyng* v. *Bugbee Distributing Co.,* 133 Fla. 419, 182 So. 801 (1938); *Hill* v. *M. S. Alper & Son, Inc.* 106 R. I. 38, 256 A.2d 10 (1969); *Davis Co.* v. *Shepard Co.,* 71 R. I. 499, 47 A.2d 635 (1946).

The term "turn over" as it appears in the contract before us has a well-known meaning. It can be found in Webster's Third New International Dictionary (unabridged) where "turn over" is defined as to "hand over, deliver, transfer." In our opinion "turn over" connotes a physical act of transferring possession. It implies a change in possession of the fee from Kelly's-Rhode Island to Flanagan. With the change, the fee becomes commission due Flanagan. The observation made by the United States Supreme Court, when in speaking of a "turnover" order in bankruptcy proceedings, is most appropriate to this appeal. The Court remarked that an order to the bankrupt to turn over his property to the trustee is applicable only when there exists such property or its proceeds and "the possession thereof" by the bankrupt. *Maggio* v. *Zeitz,* 333 U. S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948).

Today television viewers and readers of the sports pages of a newspaper are given a statistical breakdown as to the number of "turnovers" occurring during a basketball or football game. The sports devotee knows that a turnover is tallied every time a team loses possession of the ball to its opponent without first having scored some points usually by way of a touchdown, field goal, basket or foul shot. It is obvious that whether we are speaking about sports, bankruptcy law, or franchise commissions, there can be no "turn over" unless first there is possession of the appropriate item in the turnover.

Even if in seeking to give viability to the terms of the

contract we view the circumstances surrounding its execution in August 1964,[2] Flanagan has failed to persuade us that the term "turn over" should be given a meaning other than what we have already attributed to it. The president of Kelly's-Florida testified for Flanagan. His wife, Deloris, is entitled to $1,500 of the first $3,000 commission due Flanagan.[3] The president stated that this particular section had been made part of the agreement to "protect" Flanagan for all the work he had done in New England. He emphasized, however, that all moneys paid Flanagan by his corporation were franchise fees which had been "turned over" to Flanagan as his commission for finding the site. This executive made it quite clear that until the franchise fee was paid, there was no commission due plaintiff. We think it clear, both from the contract's terms and the actions of the contracting parties, that Kelly's-Rhode Island was to act as a transfer agent and not as a collection agent for Flanagan. If the franchise fee was paid, it was then to be delivered to Flanagan. There was no duty on the Rhode Island corporation to sue the Lowell franchise to obtain money destined for Flanagan.

Finally, the plaintiff attempts to make much of the fact that in July 1966 the Lowell operator and Kelly executed two franchise agreements covering the units which commenced operations in 1965. Both agreements stipulate that Kelly's-Rhode Island is, "on the opening of the location specified herein," obligated to Kelly's-Florida to pay a franchise fee in the amount of $3,000. A method of

---

[2]This approach is used in *Underwood* v. *Underwood,* 64 So.2d 281 (Fla. 1953) and *Hill* v. *M. S. Alper & Son, Inc.,* 106 R. I. 38, 256 A.2d 10 (1969).

[3]At trial, there was a dispute as to the maximum amount of any money judgment that could be entered in Flanagan's favor. He insisted that he was entitled to a judgment of $6,000. Kelly's, on the other hand, contended that since Deloris was not a party plaintiff, the most Flanagan could collect was $4 500. In view of our conclusion, this phase of the litigant's controversy becomes academic.

paying this amount is also spelled out. It is a two percent royalty on all gross receipts over and above the first $50,-000. While we are somewhat uncertain as to the exact nature of this obligation, we will assume that Flanagan can benefit therefrom. This assumption, however, is of no help to Flanagan because in bringing this action it was his burden to show that each restaurant had surpassed the $50,000 mark and that the two percent royalty payments had been made to Kelly's-Rhode Island. There is absolutely no such evidence in the record.

The plaintiff's appeal is denied and dismissed.

JOSLIN, J., did not participate.

*Peter Palombo, Jr.,* for plaintiff.

*Edward J. Regan,* for defendant.