Sheila M. LYONS

v.

**SALVE REGINA COLLEGE et al.**

Civ. A. No. 76–0390.

United States District Court,
D. Rhode Island.

Nov. 19, 1976.

Walter R. Stone, Providence, R. I., for plaintiff.

Peter J. McGinn, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

In this action, plaintiff Sheila Lyons, a former nursing student at defendant Salve Regina College, seeks specific relief and damages for an alleged breach of contract. According to plaintiff, the defendant breached its contract by taking actions unauthorized by, and contrary to, the rules of the College. The parties are agreed that these rules, promulgated by the College and accepted for consideration by the plaintiff, constituted a contract. As a result of this alleged breach, plaintiff claims that she was improperly forced out of the Nursing Department, graduating with a psychology degree instead.

The Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1332 (1970) (diversity of citizenship; amount in controversy exceeding $10,000.).

I

Defendants, at the time this case was heard, moved the Court to dismiss the complaint for lack of subject matter jurisdiction, contending that plaintiff was in fact a Rhode Island resident and that the amount in controversy did not exceed $10,000. exclusive of interest and costs. The Court reserved judgment on this motion, pending the hearing, at which the parties offered evidence on both the jurisdictional questions and the merits. The Court is now prepared to rule on defendants' motion to dismiss and the same is hereby denied for the reasons that follow.

Defendants' contention that the Court is without jurisdiction because the amount in controversy is less than $10,000 cannot be sustained. While the burden of establishing the jurisdictional amount in this case is on the plaintiff, that burden is not heavy. She must simply show that it does not appear to a legal certainty that the amount in controversy is less than $10,000. *Gibbs v. Buck,* 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); *Murray v. Vaughan,* 300 F.Supp. 688, 694 (D.R.I.1969). Absent evidence of bad faith the determination is made by examining the face of plaintiff's complaint. *Horton v. Liberty Mutual Insurance Co.,* 367 U.S. 348, 353, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961).

Defendants argue that because plaintiff testified that her father paid her tuition at Salve Regina College, she is not monetarily damaged by the College's alleged breach of contract and therefore has not brought to this Court a controversy regarding an amount in excess of $10,000. This argument mistakes the basis upon which the "amount in controversy" is determined. The proper basis is the "value of the right sought to be gained by the plaintiff". *Hedberg v. State Farm Mutual Automobile Insurance Co.,* 350 F.2d 924, 928 (8th Cir. 1965) (per Blackmun, J.). Here plaintiff alleges that the College's action has "seriously damaged plaintiff's opportunities for higher education and employment as a Nurse" and seeks a mandatory injunction reinstating her in the nursing program at the College. She has testified that she desires to pursue a career as a nurse. If unsuccessful in her efforts to resolve her problems, her testimony indicates that she will find it difficult if not impossible to transfer to another school and will have to begin her nursing studies all over again, entailing expenses in excess of $10,000. In

addition, since leaving Salve Regina, plaintiff has sought employment in lesser paying jobs in the health care field. She has been thus far unable to gain employment, but if she does, the Court takes judicial notice that she will earn less money in the health care field without a nursing degree than she would if she had one. *Cf. Walsh v. Local Board No. 10*, 305 F.Supp. 1274, 1276 (S.D.N.Y.1969). Absent any relevant evidence in support of defendant's position, the Court will accept plaintiff's good faith allegation that the amount in controversy exceeds $10,000.[1] *See Silva v. East Providence Housing Authority*, 390 F.Supp. 691, 694 (D.R.I.1975).

■ Defendants also seek dismissal on the grounds that plaintiff is in fact a resident of Rhode Island and that the diversity required for this Court's jurisdiction under 28 U.S.C. § 1332 is therefore lacking. The Court does not agree. Out-of-state students are generally "viewed as temporary residents who are located in the state only for the duration of and for the purpose of their studies". 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3619 (1975). It is therefore usually presumed that they retain their domicile at their former place of abode. *See Campbell v. Oliva*, 295 F.Supp. 616, 619 (E.D.Tenn. 1968); *Mallon v. Lutz*, 217 F.Supp. 454, 456 (E.D.Mich.1963); *Bainum v. Kalen*, 272 Md. 490, 325 A.2d 392, 398 (1974). In the present case, plaintiff has testified that she intends to return to Connecticut when she completes school. As evidence of her ties to that state, she has submitted a Connecticut

driver's license, a Connecticut "Majority Card", and a Connecticut voting card.[2]

■ On the other hand, defendants point to several facts claimed to be inconsistent with temporary residence. Plaintiff placed advertisements in the Newport (R.I.) *Daily News* seeking "temporary or permanent" employment. In addition, defendant Megley has testified, and plaintiff does not deny, that plaintiff told her that she wanted to stay in Rhode Island. Finally, defendants have shown that plaintiff was registered to vote in Rhode Island and changed her registration to Connecticut only after she took steps to begin this lawsuit.

Notwithstanding this evidence, the Court finds that plaintiff is in fact a Connecticut resident. This finding is based on plaintiff's statement regarding her intentions, which the Court finds entirely credible, *cf. Campbell v. Oliva, supra*, 295 F.Supp. at 618, and the supporting evidence.

This finding is not altered by plaintiff's seemingly inconsistent acts and statements. In view of employers' well-known hesitancy to accept as employees persons who do not offer assurances that they will be permanent, plaintiff's advertisement seeking "temporary or permanent" employment is not conclusive on the issue of domicile. Plaintiff's statement to defendant Megley that she wished to remain in Rhode Island was made in the course of a discussion about transferring to an out-of-state nursing school and the Court does not understand it to mean anything more than that plaintiff wished to complete her schooling here. With regard to plaintiff's temporary registration as a Rhode Island voter, the

1. In addition to the value of the injunctive relief, which the Court cannot say is legally certain to be less than $10,000, plaintiff seeks an additional $10,000 in damages. The total relief sought thus clearly meets the jurisdictional amount required by 28 U.S.C. § 1332. Defendants have not cited any authority indicating that the money damages sought cannot be awarded under Rhode Island law and the Court must therefore accept the *ad damnum* for purposes of deciding whether the jurisdictional amount has been met. *See* 14 C. Wright, F. Miller & E. Cooper, Federal Practice and Procedure § 3702 at 394–395 (1976).

2. Defendants argue that since plaintiff has graduated she is no longer a student and should not be able to avail herself of the student presumption. The Court is somewhat astonished at defendants' temerity in raising this point in view of the fact that it is defendants' refusal to re-admit plaintiff in the nursing program that is entirely responsible for her present non-student status. In any case, defendants have submitted evidence to rebut any presumption of foreign domicile and the Court has weighed that evidence along with that of plaintiff's in reaching its conclusion.

Court accepts plaintiff's explanation that she registered in Rhode Island because she was anxious to vote in the presidential primary. In brief, no evidence has been introduced that effectively rebuts plaintiff's statement that her present intention is to return to Connecticut when her temporary sojourn in Rhode Island is over. This is sufficient to establish diversity and the Court accordingly turns to the merits in this controversy.

## II

The issues in this case center largely around the state of mind of the parties. There is little dispute as to external events.

In September 1975, plaintiff, Sheila Lyons, entered into her fourth and final year as a nursing student at defendant Salve Regina College. She had been a successful student up until that time, receiving A's and B's in nearly all of her courses and serving as president of her class. Among the courses for which Lyons registered was a required clinical and theoretical course, designated as Nursing 402A. The course ran from early September until the end of October.

On September 29, 1975, Lyons went to Boston by ambulance, accompanying an ill friend to Massachusetts General Hospital. She returned to class on October 2, having missed three classes and two clinical experiences, and thereupon consulted with her instructor, Maureen Hull. Lyons claims that Ms. Hull assured her that the only result of her absence would be that she would receive a grade of "Incomplete" for the course. Ms. Hull claims that no such assurances were given. In any case, Lyons continued to attend classes, submitted papers, and took the final exam, even though she could have withdrawn from the course without incurring a grade of "F" had she chosen to do so before the last day of class.

The course ended in late October, but the grades were not immediately promulgated. When they were, Lyons learned that she had received an "F" rather than the al-

legedly promised "Incomplete". On December 17, 1975, Lyons formally appealed the grade of "F". This action was taken pursuant to the following provisions of the Salve Regina College Academic Information and Registration Materials for 1975:

### GRADE APPEAL

Students have the right to a formal grade appeal after the grade has been submitted and recorded. The student must, however, attempt to resolve the matter with the instructor before the process is set in motion by the Dean of Students.

### GRADE APPEAL PROCESS

If the student fails to resolve the appeal with the instructor to the satisfaction of the student, the student may request that a grade appeal committee be established. To initiate the process the student contacts the Dean of Students office. The Dean of Students sets up the process by which:

1. The student chooses a faculty member to represent his/her case.
2. The instructor chooses a faculty member to represent his/her case.
3. A third faculty member mutually acceptable to the student and to the instructor serves as chairman.

After both cases are presented to the three-member grade appeals committee, the recommendation of the committee is made to the Dean of Students/Associate Dean of the College.[3]

In February 1976, the Appeal Committee met and took testimony from Lyons and from Ms. Hull, her instructor. After hearing all the evidence, the Committee voted as follows:

1. Member Foglia: "The 'F' grade should not be altered. The student should apply to the nursing department for reinstatement to the program."
2. Member Trimbach: "It is my recommendation that Sheila Lyons be awarded the grade of Incomplete in Nursing 402A, until the work missed

---

3. Substantially similar language is contained in the 1975–1976 College Manual.

early in the Fall of 1975 is completed. The specific terms of this arrangement should be agreed upon by both parties."

3. Member Carlin: "It is recommended therefore that Sheila Lyons be granted an 'Incomplete' for the course in question and that she be allowed to make up the clinical classes and seminars that she missed." [4]

On February 11, 1976, Defendant Megley, the Associate Dean of the College, to whom the Committee's recommendations were submitted, overruled the 2–1 majority and denied Lyons' grade appeal. As a result of this decision, Lyons was dropped from the nursing program. She was, however, permitted to change her major to psychology and remain in the College.

### III

Both sides are agreed that they were parties to a valid contract, whose terms and conditions are set forth in the College Manual and in the 1975 Academic Information and Registration Materials.[5] These documents provide for the grade appeal process whose ultimate outcome Lyons is now challenging. Hence, the issue before the Court is an exceedingly narrow one: did Dean Megley's action in overturning the decision of the Grade Appeal Committee thereby reinstating Lyons' "F" in Nursing 402A, constitute a breach of contract in that it failed to follow the guidelines set forth in the College Manual and in the 1975 Academic Information and Registration Materials?

Notwithstanding defendants' claims to the contrary, there is no broad issue of academic freedom to be decided here. The Court most emphatically eschews any competence to judge the accuracy of Ms. Hull's assessment of Lyons' academic performance, the justness of the Committee's resolution of the appeal, or the sufficiency of Dean Megley's reasons for overriding the Committee. The Court could not pass judgment on such matters, sensible as it is that they implicate serious questions of academic freedom. On the other hand, the Court cannot refuse to decide whether an enforceable promise has been broken, simply because the contract is drawn between school and student, particularly when both parties agree that they stand in a contractual relationship.[6] To that decision the Court now turns.

The Court cannot determine if there was a breach until it determines precisely what the contract provided. Here, the Court must ascertain whether the parties intended that the recommendations of the Appeals Committee to Dean Megley should be binding on her and the College, or whether Dean Megley was free to ignore those recommendations if she chose. *See* text accompanying note 3, *supra*.

According to Plaintiff, the evidence shows that the College, which drafted the documents containing the disputed language, made clear by its conduct (in the person of Dean Megley) that the recommen-

---

4. Defendants' Exhibit K.

5. Defendants would classify plaintiff as third-party *donee* beneficiary of a contract between the College and plaintiff's father, who paid the tuition. Assuming *arguendo* that this is true, there is no claim that plaintiff's rights as third-party beneficiary would be any different in the present case than if the contract runs directly between her and the College.

It is a "well-settled rule that the relations between a student and a private university are a matter of contract". *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir. 1961) (dictum).

6. The Court was surprised that counsel for the defendants raised the spectre of academic free-

dom in this case, and has waited in vain for some enlightenment as to where academic freedom is implicated *in the slightest degree*. Unfortunately, no such enlightenment has been forthcoming. If counsel has serious First Amendment arguments to make, they should be made so that the Court can fairly assess them. If such issues are raised only as straw men, they are better not raised at all. Nevertheless, the Court has canvassed the issue itself, and is satisfied that it can be resolved entirely as a contract matter without eroding in any way the autonomy of private education. *Cf. Berrios v. Inter American University*, 535 F.2d 1330 (1st Cir. 1976).

dation was to be binding and that Lyons was wrongfully deprived of a grade of "Incomplete", as voted by the committee.

Defendants, on the other hand, deny that the written contract ever envisaged or that Dean Megley ever understood that the Committee's recommendation would be anything more than advisory. The Dean had the right to choose not to follow the Committee's advice, defendants argue, and therefore Lyons has no legal basis upon which to complain.

■ Defendants further submit that it is not open to the Court to examine the conduct of the parties in order to determine the proper construction of the contract. Defendants contend that the word "recommendation" means a course of action that is merely advised or exhorted, not one that is required. According to defendants, because the meaning of recommendation is so clear, under Rhode Island law this Court is bound by the "plain meaning" rule: where contractual language is unambiguous on its face, a court may not look beyond the four corners of the instrument in order to ascertain the intent of the parties.[7]

There are several difficulties with this position. It is true that the Rhode Island Supreme Court has recently stated that "the clear and unambiguous language set

out in a written instrument is controlling as to the intent of the parties thereto and governs the legal consequences of the contract provisions", *Theroux v. Bay Associates, Inc.*, 339 A.2d 266, 268 (R.I.1975). However, this proposition does not answer *the question of how the initial determination of the ambiguity vel non of the contract language is to be made.*[8]

The *Theroux* court cites to *Flanagan v. Kelly's System of New England, Inc.*, 109 R.I. 388, 286 A.2d 249 (1972) and to *Hill v. M. S. Alper & Son, Inc.*, 106 R.I. 38, 256 A.2d 10 (1969). These cases elucidate the Supreme Court's statement in *Theroux*. In *Flanagan*[9] the court, in determining that the expression "turn over" was not ambiguous, looked at the dictionary meaning, the meaning of the term in various specialized settings, *and at the subsequent conduct of the parties.* 106 R.I. at 393–394, 286 A.2d at 251–252. Moreover, the *Flanagan* court approved the approach taken in the *Hill* case, in which Mr. Justice Joslin laid out the following rules for the interpretation of contracts:

> In interpreting that instrument it is basic that the intention of the parties must govern if that intention can be clearly inferred from its terms and can be fairly carried out consistent with settled rules of law. *Hatch v. Sallinger*, 47 R.I.

---

**7.** This rule, in its extreme form, has been sharply criticized:

> A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained.

*Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & R. Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 564, 442 P.2d 641, 644 (1968) (Traynor, C. J.).

The better rule

> requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. . . . If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, is "fairly susceptible of either one of the two interpretations contended for . . .", extrinsic evidence relevant

to prove either of such meanings is admissible. *Id.*, 69 Cal.Rptr. at 565, 442 P.2d at 645–646.

*See Hohenstein v. S. M. H. Trading Co.*, 382 F.2d 530, 531–532 (5th Cir. 1967); *Hamilton v. Wosepka*, 261 Iowa 299, 154 N.W.2d 164, 167–172 (1967).

**8.** *Compare Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & R. Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 566 n.8, 442 P.2d 641, 646 n.8 (1968):

> Extrinsic evidence has often been admitted in such cases on the stated ground that the contract was ambiguous . . . . This statement of the rule is harmless if it is kept in mind that the ambiguity may be exposed by extrinsic evidence that reveals more than one possible meaning.

**9.** *Flanagan* was decided under Florida law but the Supreme Court indicated that Rhode Island law was identical. 106 R.I. at 392–393, 286 A.2d at 251.

395, 133 A. 621; *Newport Water Works v. Taylor*, 34 R.I. 478, 83 A. 833; *Reynolds v. Washington Real Estate Co.*, 23 R.I. 197, 49 A. 707; *Anthony v. Comstock*, 1 R.I. 454. In ascertaining what the intent is we must look at the instrument as a whole and not at some detached portion thereof. *Shuster v. Sion*, 86 R.I. 431, 136 A.2d 611. And, although there is no ambiguity, we will nonetheless consider the situation of the parties and the accompanying circumstances at the time the contract was entered into, not for the purpose of modifying or enlarging or curtailing its terms, but to aid in the interpretive process and to assist in determining its meaning. Restatement of Contracts § 235(d); see *Swinburne v. Swinburne*, 36 R.I. 255, 90 A. 121; *Wesley v. M. N. Cartier & Sons*, 30 R.I. 403, 75 A. 626; *Deblois v. Earle*, 7 R.I. 26. If, after applying those and the other established standards of interpretation, the meaning still remains uncertain, we will prefer an interpretation which gives a reasonable, lawful and effective meaning to all manifestations of intention, rather than one which leaves a part of those manifestations unreasonable, unlawful or no effect. Restatement of Contracts § 236(a); see *Wall & Co. v. Imperial Printing & Finishing Co.*, 165 A. 898 (R.I.); *Gross v. Clark*, 43 R.I. 389, 113 A. 115.

Justice Joslin's language in *Hill* and the Rhode Island Supreme Court's mode of analysis in *Flanagan* make it clear that Rhode Island law does not take the rigid approach to contract construction suggested by defendants even where a word or phrase in a contract, by itself, would appear to have a straightforward meaning.

▪ Even if the Court were to accept plaintiff's version of the plain meaning rule, this case is not one where the contractual language is free from ambiguity. While a recommendation is concededly often understood to be hortatory or advisory only, this is by no means the only possible construction. In *Newport Hospital v. Harvey*, 49 R.I. 40, 43, 139 A. 659, 661 (1927), the Rhode Island Supreme Court recognized that in wills and trusts "to recommend" can be the equivalent of "to command", "clothed merely in language of civility". Similarly, it has been held in a criminal case that a trial judge who told a jury that they were permitted to accompany their verdict with a "recommendation to mercy" erred when he failed also to "inform them in plain language that such recommendation is without binding effect on the court in the matter of sentence". *State v. Ruzzo*, 63 R.I. 138, 144, 7 A.2d 693, 695 (1939). Clearly, such a holding would be unnecessary if the Supreme Court found the word "recommendation" to be without ambiguity.

These examples of the ambiguous use of "recommendation" are taken from contexts that differ factually from the case at bar. They are nevertheless most persuasive of the point at issue and reinforce the Court's conclusion that it must look beyond the words of the contract, not to alter its meaning but to determine what effect the parties intended the Appeals Committee's recommendation to have.

▪ In resolving this factual question, cf. *Minor v. Narragansett Machine Co.*, 71 R.I. 108, 116, 42 A.2d 711, 715 (1948), the practical construction placed on the disputed terms by the parties themselves "will ordinarily be resorted to by the court to ascertain [their] true intent". *Coe v. Zwetchkenbaum*, 89 R.I. 358, 153 A.2d 517, 520 (1959); *Cook v. Dunbar*, 66 R.I. 266, 274, 18 A.2d 658, 662 (1941); see Restatement of Contracts § 235(e) (1932).

In the present case, Dean Megley, the person charged by the College Manual with receiving and acting upon the recommendation of the Appeals Committee, testified that she understood that the Committee's recommendations would be suggestions only and in no way binding. However, the Court finds that this testimony is totally inconsistent with her other statements and writings.

On January 26, 1976 Dean Megley promulgated procedural guidelines to be fol-

lowed by the Committee in its hearing on the Lyons case.[10]

In these procedures she stated that "[t]he decision of the hearing committee should be final, subject *only* to the right of appeal[11] to the Dean of Students". (emphasis added). This would seem to the Court to mean just what it says and to be strong evidence that the parties[12] understood that the word "recommendation" as used in the contract meant a recommendation that was binding unless appealed. The entire document makes it quite clear that "should" is used throughout the text in place of "shall" and is mandatory, not hortatory. Otherwise, other phrases used in the procedures, such as "[i]mproperly acquired evidence should not be admitted", are devoid of sense. The Court finds that the January 26 memorandum set forth at note 10, *supra*, indicates that Dean Megley understood herself to be bound to follow the "recommendations" of the Appeals Committee.

Additional evidence, in the Court's mind conclusive, to support this finding is provided by a memorandum from Dean Megley to Sheila Lyons dated January 27, 1976.[13] In

10. The full text of these is as follows:

HEARING—COMMITTEE PROCEDURES
GRADE APPEAL

1. The faculty member should be informed of the reasons for the grade appeal with sufficient particularity, and in sufficient time, to insure opportunity to prepare a response.
2. The burden of proof rests upon the student making the appeal.
3. The faculty member should be given an opportunity to testify and to present evidence and witness. The faculty member should have an opportunity to hear and question adverse witnesses. In no case should the committee consider statements against the faculty member unless the faculty member has been advised of their content and of names of those who made them, and unless the faculty member has been given the opportunity to rebut unfavorable inferences which might otherwise be drawn.
4. All matters upon which the decision may be based must be introduced into evidence at the proceedings before the committee. The decision should be based solely upon such matters. Improperly acquired evidence should not be admitted.
5. In the absence of a transcript, there should be both a digest and a verbatim record, such as a tape recording, of the hearing.
8. The decision of the hearing committee should be final, subject only to the right of appeal to the Dean of Students. [It must be noted no appeal was taken in this case]
9. The committee's decision along with all records is forwarded to the Dean of Students.
10. The Dean of Students notifies both parties of the decision of the committee.

(Defendants' Exhibit I).

11. This "appeal" should not be confused with the "grade appeal" decided by the committee, whose recommendations are passed on to Dean of Students. If the Student is dissatisfied with the recommendation that the Committee makes to the Dean of Students after it has heard the grade appeal, then the student can "appeal" the Committee's recommendation as to the proper disposition of the "grade appeal" to the Dean of Students. An "appeal" would lie if the student were deprived of due process, if there were new evidence, or if it were contended that the Committee's resolution of the "grade appeal" was unreasonable. *See* Defendants' Exhibit H. There is no indication that there was any procedure for appeal by the faculty member and I find that no such procedure was envisaged.

12. There is no contention that plaintiff, the other party to the contract, ever understood that the decision would be anything other than final.

Thus, in referring to the intent of the parties, the Court is referring to the intent of defendants, which alone has been put at issue.

13. MEMORANDUM

TO: Sheila Lyons
FROM: Dr. Megley
RE: Formal Grade Appeal

The committee to hear your grade appeal has been set up. Its members are Ann Foglia (faculty choice), Charles Trimbach (student choice), and David Carlin (the faculty party named by both to serve on the committee). I met with them yesterday to discuss procedure. Charles Trimbach will contact you concerning this process.

In the meantime, I must alert you to the fact that I have authorized a conditional registration in Nursing 406. However, *should the committee reach an unfavorable decision* you will be held to the following guideline of the Nursing Department:

"Any student who gets a D (or below) in either theory or clinical in a Nursing course would not be allowed to continue in the Nursing program."

and your registration will be dropped. In short, your registration depends upon a favorable outcome of your appeal.

Please be aware that your registration in Nursing 406 is not official until I lift the "condi-

this memorandum, written before the meeting of the Appeals Committee, Dean Megley informed Lyons that she could register conditionally for the final semester and that such registration would be revoked if the Committee's "*decision*" were unfavorable. Registration would be made final if the Committee's "*decision*" were favorable. This letter contains not a hint that the Dean has the power to overturn the Committee's recommendation.[14] The Court finds it impossible to reconcile this letter with any other conclusion than that the recommendation would be final and binding. Therefore, the Court finds that Dean Megley, before the hearing was held, understood the recommendation of the Appeals Committee to be final. Based on this fact, the Court further finds that the intent of the parties was that the word "recommendation" as used in the College Manual and in the Academic Information and Registration Materials for 1975 would mean a rec-

ommendation that was binding on the Dean of Students.

 It follows that defendants' action in refusing to abide by the decision of the Appeals Committee constituted a breach of contract.[15] In making this finding, the Court is not, as defendants contend, arbitrarily imposing the legal technicalities of a commercial transaction upon what is essentially an academic dispute. Rather the Court is simply holding that the College, as any other promissor, must abide by procedures to which it has bound itself and its students, until such time as it sees fit to change those procedures.[16]

### IV

Plaintiff seeks specific performance of the College's contractual obligation to follow the binding recommendation of the Committee, and thus to award her the grade of "Incomplete" in Nursing 402A. In addition she seeks reinstatement in the nursing program, waiver of tuition, and substantial money damages.[17]

tional". I will do this when and if the appeal committee *reaches a favorable decision.*

Once again, I ask that you refrain from public comment until the appeal is processed. (Emphasis added).

14. After reinstating Lyons' "F", Dean Megley indicated that she never intended to be bound by the Committee's recommendation, that the decision was hers alone. However, the Court finds the pre-hearing documents of January 26 and January 27 convincing and does not accept this post factum explanation. Likewise, the Court concludes that Dean Megley's implication, *see* Defendants' Exhibit "P", that only a unanimous Committee recommendation would be binding on her, is inconsistent with her pre-hearing instructions to the Committee, *see* Defendants' Exhibit H. Absent explicit language to the contrary, the only reasonable inference to be drawn from that document is that a "decision of the committee" would result from a majority vote. Unanimity became a possible requirement only after the decision of the Committee, to which Dean Megley understood herself bound, turned out to be erroneous in the Dean's view.

15. There is no suggestion that Lyons waived her rights under the contract by transferring her major to psychology. Nor would the facts support such a theory. When her appeal was denied she was faced with the unpleasant prospect of applying for re-instatement, thus arguably conceding the validity of the challenged

procedure, or making the best of a bad situation by accepting a degree in psychology rather than no degree at all. There is no evidence that Lyons intended to waive her rights under the contract, which in this case amount to a right to continue in the nursing department absent a grade of "F".

16. The Court's holding that Dean Megley's subsequent conduct makes clear that the parties contracted for binding recommendation, makes it unnecessary to reach the question of whether the appeals procedures set up by Dean Megley, *see* note 10 *supra*, amounted to a modification or novation of a pre-existing contract. It is also unnecessary to decide whether Dean Megley was empowered to make such a modification of whether Lyons authorized her representative on the Appeals Committee, Charles Trimbach, to assent to any modification.

There is no question, of course, that the College *could*, if it so chose, now re-write the rules to provide Dean Megley with an automatic right of reversal of any hortatory recommendation of the Grade Appeals Committee.

The Court notes that the Grade Appeal Procedure had apparently never been used prior to the Lyons case, and has not been invoked subsequently.

17. In conference with the Court it was agreed that the motion for temporary relief be passed and that the matter be heard on motion for permanent injunction. The parties did not re-

**1364**

■ The Court is prepared to order the award of the grade of "Incomplete" at this time. Furthermore, reinstatement is the appropriate remedy in this type of case; damages cannot make plaintiff whole. *See Slaughter v. Brigham Young University,* 514 F.2d 622, 627 (10th Cir. 1975); *Anthony v. Syracuse University,* 130 Misc. 249, 223 N.Y.S. 796, 806 (Sup.Ct.1927). Although this case is unusual because plaintiff has already received a degree from the College, reinstatement would nevertheless seem to be proper. The purpose of reinstatement, like any other contract remedy, is to put plaintiff in the same position she was in before the breach of contract occurred, insofar as a court can do this. In the present case, if the College had kept its bargain, Lyons would have had the opportunity to take such additional courses as would have permitted her to graduate with a major in nursing.

This is what Lyons bargained for when she enrolled in Salve Regina College; she did not bargain for a degree in psychology, nor is there any evidence that she accepted such a degree for any reason besides mitigation of damages. Therefore, it would appear that the College will not have fulfilled its contractual obligation to Lyons until it gives her the opportunity to meet its requirements for a nursing major. *Cf. Slaughter v. Brigham Young University, supra* at 627.

The parties will agree upon the appropriate order and submit the same to the Court.

solve if and when the Court should determine the questions of tuition waiver and damages. Since no evidence on either of these two points was presented the Court will entertain arguments as to whether or not the same are still open.